BOWNES, Circuit Judge.
 

 Hector Manuel Rodriguez Estrada (Rodriguez), former operating trustee of the bankrupt San Juan Hotel Corporation, appeals from a judgment of the district court surcharging him $3,434,081.82. The district court found that Rodriguez, in various ways, intentionally violated his fiduciary duties as trustee, causing enormous harm to the estate and its creditors. Rodriguez challenges the legal basis for the district court’s action, and also argues that the court’s factual findings were, for the most part, clearly erroneous. We affirm in part, reverse in part and remand.
 

 I. BACKGROUND
 

 This is the fourth appeal to reach this court concerning the San Juan Hotel bankruptcy and Rodriguez’s performance as bankruptcy trustee. In the first case,
 
 In re El San Juan Hotel Corp. (San Juan Hotel I),
 
 809 F.2d 151 (1st Cir.1987), we dismissed as nonappealable Rodriguez’s challenge to an action filed against him by the United States. Rodriguez claimed that the United States was not a proper party to pursue claims against him on behalf of the estate. Then, in
 
 Connecticut General Life Ins. Co. v. Universal Ins. Co.,
 
 838 F.2d 612 (1st Cir.1988), we adjudicated the right to receive insurance proceeds from a fire at the San Juan Hotel, some of which erroneously had been paid to Rodriguez as trustee. We also held Rodriguez personally liable to a hotel creditor for intentionally refusing to pay over the proceeds when he knew he was legally obligated to do so. Finally, in
 
 In re El San Juan Hotel Corp. (San Juan Hotel II),
 
 841 F.2d 6 (1st Cir.1988), we affirmed the dismissal of a second lawsuit against Rodriguez on behalf of the estate, this one filed by Marshall Kagan, the former comptroller of the hotel.
 

 The present action is an appeal on the merits from a judgment in the action by
 
 *935
 
 the government we permitted to go forward in
 
 San Juan Hotel I.
 
 The background for this complicated maze of litigation is briefly summarized immediately below, with more detailed discussion reserved for later sections concerning the specific items for which Rodriguez was surcharged.
 

 The story begins on May 20, 1980, when the San Juan Hotel Corporation, facing some $40 million in debts, filed a petition for reorganization under Chapter 11 of the United States Bankruptcy Code. 11 U.S.C. §§ 1101-46. On July 10 of the same year, Rodriguez was appointed as operating trustee. Although 11 U.S.C. § 322 requires that a person post bond in order to qualify as a trustee, the bankruptcy court, for reasons which are still not altogether clear, permitted Rodriguez “to serve for the present without bond.”
 
 In re San Juan Hotel Corp.,
 
 No. B-80-00259, slip op. at 4 (Bankr.D.P.R. July 10,1980).
 
 [1]
 
 On July 24, following representations by Rodriguez to the bankruptcy court that he was familiar with and involved in running the hotel, the court approved provisional compensation for Rodriguez in the amount of $750 per week plus expenses, which Rodriguez was authorized to draw as earned.
 

 The financial problems which caused the hotel to file bankruptcy proceedings did not improve significantly during the period of reorganization. The hotel continued to lose millions of dollars. Finally, on March 23, 1983, the Chapter 11 proceeding was converted into a Chapter 7 proceeding on motion of a creditor. Rodriguez continued as liquidation trustee until September of 1983 when he was removed pursuant to a unanimous vote of the creditors. He was replaced as trustee by Hans Lopez Stubbe (Lopez), who continues as trustee to this day and in whose name the present action was brought.
 

 Lopez found the estate to be in a sorry state. The financial records of the hotel, which Rodriguez delayed several months in turning over to Lopez, were in disarray and took another several months to organize. Eventually, however, it became obvious to Lopez that Rodriguez had engaged in gross mismanagement of the estate by, among other things, failing to implement necessary cost-saving measures, keeping inadequate financial records, deliberately failing to pay taxes and other administrative expenses and using hotel resources for the personal benefit of himself, his family and friends. Lopez considered filing suit against Rodriguez on account of his mismanagement, but declined to do so, because of doubts that a judgment against Rodriguez would be collectible and because the estate lacked sufficient funds to prosecute the action.
 
 San Juan Hotel
 
 I, 809 F.2d at 153.
 

 In Lopez’s stead, the United States — a large creditor of the estate due to outstanding tax liability — filed an
 
 ex parte
 
 application with the bankruptcy court seeking permission to file suit against Rodriguez on behalf of the estate. Lopez consented to the suit provided that it would not cost the estate any money.
 
 [2]
 

 San Juan Hotel II,
 
 841 F.2d at 8. The bankruptcy court then granted the United States leave to file a complaint against Rodriguez, which it did on May 17, 1985. Following some pretrial maneuvering culminating in this court’s
 
 San Juan Hotel I
 
 ruling, the case came on for trial in late January of 1987. Seventeen witnesses testified for the United States about Rodriguez’s actions as trustee, with the most extensive testimony coming from Kagan, the former comptroller. As someone with financial oversight authority at the hotel who had worked with Rodriguez, Kagan seemed to have the broadest and most detailed knowledge of how Rodriguez handled the hotel’s financial affairs. Rodriguez himself did not testify. In his defense, he presented only the testimony of Miguel de Angel, a consultant hired by Rodriguez who had formerly
 
 *936
 
 worked as an outside auditor for the hotel, and Rafael Ruiz Diaz (Ruiz), a former casino director at the hotel. Hundreds of pages of financial documents relating to the hotel’s operations were introduced into evidence by both sides.
 

 Crediting the testimony of Kagan while implicitly discrediting de Angel and Ruiz, the district court ruled for the plaintiff. In a lengthy opinion now published at 71 B.R. 413 (D.P.R.1987), the court reviewed the evidence in detail and determined that Rodriguez had in a number of material aspects intentionally breached his fiduciary duties as trustee. In essence, the court found that, by May of 1981, it was obvious to Rodriguez that reorganization of the hotel was not a reasonable option, and that the only sensible alternative was to convert the bankruptcy proceedings into a Chapter 7 liquidation. Rodriguez, however, continued to operate the hotel for his own benefit, reaping tangible benefits such as free rooms, free meals and continued weekly fee and expense draws. The court also found that Rodriguez sought to keep the hotel in operation and then to sell it so as to obtain a large fee on the sale.
 
 [3]
 

 Relying principally on the Supreme Court’s decision in
 
 Mosser v. Darrow,
 
 341 U.S. 267, 71 S.Ct. 680, 95 L.Ed. 927 (1951), the district court held that Rodriguez was liable for the harm caused by his intentional breach of fiduciary duty. The court surcharged him for eleven specific items whose value totaled $3,434,081.82. Additional liability for a twelfth item, the value of which could not then be determined, was also found.
 

 Following the entry of judgment on May 4, 1987, Rodriguez filed a motion to amend which the court characterized as requesting, in effect, additional findings of fact. The motion was denied on May 8, 1987. Both Rodriguez and Lopez
 
 [4]
 
 filed notices of appeal. Lopez appealed only the district court’s failure to award punitive damages. Lopez then moved to dismiss both appeals on the ground that the district court had not stated its reasons for failing to award punitive damages. The motion to dismiss was denied on September 16, 1987, but, retaining jurisdiction, we stayed the appeals and remanded the case for the limited purpose of having the district court state its rationale on punitive damages. The district court did so in an order dated November 2, 1987, which noted that it had considered punitive damages but denied them in the exercise of its discretion because it found the plaintiff fully compensated by the awarded damages and saw no useful purpose for punitive damages. Thereafter, we lifted the stay on Rodriguez’s appeal and granted Lopez’s motion for voluntary dismissal of his appeal.
 

 II. THRESHOLD DEFENSES
 

 Rodriguez raises two threshold arguments for overturning the district court’s judgment, which we consider before delving into Rodriguez’s specific complaints about the twelve surcharged items.
 

 A.
 
 Lopez’s Standing To Pursue Claims Against Rodriguez
 

 Rodriguez argues that Lopez, the nominal plaintiff in this case, lacks standing to sue Rodriguez for most, if not all, of the damages assessed. His standing argument has two components. First Rodriguez asserts that Lopez can only sue him for harms actually suffered by the estate, not harms suffered by nonparty creditors. Second, and presumably alternatively, Rodriguez argues that Lopez lacks statutory authority to assert any claims against Rodriguez because Rodriguez’s potential liability was not “property” of the estate at the time bankruptcy proceedings began. We agree, in part, with Rodriguez’s first argument, but we reject his second.
 

 There is no question that the governing law in this case is
 
 Mosser v. Darrow,
 
 341 U.S. 267, 71 S.Ct. 680, 95 L.Ed.
 
 *937
 
 927 (1951), and its progeny. In
 
 Mosser,
 
 the Supreme Court established the general proposition that bankruptcy trustees may be held personally liable for breaches of fiduciary duty. The defendant trustee in
 
 Mosser
 
 allowed two employees to trade on inside information and was surcharged for the profits they made. In affirming, the Court said, “trusteeship is serious business and is not to be undertaken lightly or so discharged. The most effective sanction for good administration is personal liability for the consequences of forbidden acts.”
 
 Id.
 
 at 274, 71 S.Ct. at 683. Following
 
 Mos-ser,
 
 federal courts including this one have “uniformly held that bankruptcy trustees are subject to personal liability for the willful and deliberate violation of their fiduciary duties.”
 
 Connecticut General,
 
 838 F.2d at 621 (citing
 
 In re Gorski,
 
 766 F.2d 723, 727 (2d Cir.1985);
 
 In re Cochise College Park, Inc.,
 
 703 F.2d 1339, 1357 (9th Cir.1983);
 
 Ford Motor Credit Co. v. Weaver,
 
 680 F.2d 451, 461 (6th Cir.1982);
 
 Sherr v. Winkler,
 
 552 F.2d 1367, 1375 (10th Cir.1977)).
 
 [5]
 
 Such liability may be imposed either for the benefit of the estate in the form of a surcharge, or for the benefit of a creditor in the form of damages in a direct action against the trustee.
 
 Compare Mosser,
 
 341 U.S. 267, 71 S.Ct. 680 (surcharge payable to estate)
 
 with Connecticut General,
 
 838 F.2d at 621-22 (liability to creditor)
 
 and In re Rigden,
 
 795 F.2d 727 (9th Cir.1986) (liability to creditor).
 

 This statement of the law, we believe, itself effectively refutes Rodriguez’s second standing argument. The Supreme Court in
 
 Mosser
 
 broadly construed federal courts’ equitable powers to surcharge trustees for “forbidden acts.” It did not require a special statutory provision authorizing a successor trustee to file claims against his predecessor. In
 
 Mosser,
 
 the trustee’s wrongdoing was actually called to the bankruptcy court’s attention by the Securities and Exchange Commission, an arm of the federal government. 341 U.S. at 270, 71 S.Ct. at 681-82. Here, too, it is the United States (through Lopez) that has pursued Rodriguez, and we think it would be plainly inconsistent with
 
 Mosser
 
 to dismiss the action altogether for lack of standing.
 
 [6]
 

 Returning to Rodriguez’s first standing argument (no harm to the estate), it is interesting to note that the defendant in
 
 Mosser
 
 also argued in his defense that the estate suffered no loss as a result of his actions. To that, the Court responded by noting that determining the amount of damage the trustee caused, if any, was difficult; the Court then added: “But equity has sought to limit difficult and delicate fact-finding tasks concerning its own trustee by precluding such transactions for the reason that their effect is often difficult to trace, and the prohibition is not merely against injuring the estate — it is against profiting out of the position of trust.”
 
 Mosser,
 
 341 U.S. at 273, 71 S.Ct. at 683. With this passage, we think, the Court clearly rejected the idea that a proven, quantifiable loss to the estate is a prerequisite to personal liability for trustees. At the same time, however, the degree of loss or harm has not been made irrelevant under
 
 Mosser.
 
 As the Second Circuit has noted, the purpose of a
 
 Mosser
 
 surcharge is not to punish a trustee, it is to benefit creditors who have been injured by the trustee’s acts.
 
 Gorski,
 
 766 F.2d at 727-28 (rejecting the use of a civil fine payable to the United States as a form of trustee surcharge).
 

 
 *938
 
 In order to insure that creditors are made whole without also having courts engage in open-ended punishment-by-surcharge, we think that some assessment of harm must be the guiding principle underlying
 
 Mosser
 
 liability. Where an exact amount of loss to the estate can be determined, that amount is the correct measure of damages.
 
 See Matter of Combined Metals Reduction Co.,
 
 557 F.2d 179, 197 (9th Cir.1977) (“When a trustee has breached his trust, an equity court may hold him liable for any loss or depreciation in the value of the estate resulting from the wrongful act or omission.”). Where the fact of harm can be determined but not the exact extent thereof, the estimated amount of harm to the estate should be surcharged. In
 
 Mosser,
 
 the Court essentially estimated damages by assuming that any profit made by the trustee’s employees was to the estate’s detriment.
 
 See also Combined Metals,
 
 557 F.2d at 197 (“In addition, an unfaithful trustee may be held responsible for any lost profit which would have accrued to the estate but for the breach of trust.”). Other forms of estimates might be equally acceptable. Moreover, a similar analysis of damages necessarily follows for direct actions by creditors against trustees: the exact or estimated amount of loss should be the amount of liability imposed.
 

 A natural corollary to this approach to
 
 Mosser
 
 liability is that a party may only assert against a trustee the harm it has directly suffered. Where the assets of the estate have been diminished by the trustee’s actions, the representative of the estate is the proper party to assert claims against the trustee. Conversely, where the estate itself has suffered no loss but the actions of the trustee have directly harmed a creditor, it should be the creditor, not the estate, that sues.
 
 See Gorski,
 
 766 F.2d at 727 (“In the usual case, a surcharge is imposed on the fiduciary in the amount of the actual or estimated harm suffered by either the creditors or the estate
 
 and is payable accordingly.”)
 
 (emphasis added). Were we to rule otherwise, trustees would be subject to inconsistent and multiple liability for their actions in suits by the estate
 
 and
 
 by the creditors.
 

 As set out more fully below, it is apparent that in this case the district court assessed against Rodriguez and in favor of the estate some damages suffered by the estate and some damages suffered only by third party creditors. Lopez argues that we should uphold the judgment
 
 in toto,
 
 but we disagree.
 
 [7]
 
 The fact that Rodriguez caused some harm to the estate does not mean that the estate can also be awarded damages for harms suffered by creditors of the estate. The creditors themselves must sue for those harms and, as we recognized in
 
 Connecticut General,
 
 they have an avenue for doing so.
 
 [8]
 

 B.
 
 Statute of Limitations
 

 Rodriguez moved twice before trial to dismiss this action on the ground that it was time-barred under the applicable statute of limitations. Both motions were denied without opinion. On appeal, Rodriguez renews this argument, focusing particularly on the one year Puerto Rico statute of limitations generally applicable to tort actions.
 
 See
 
 P.R.Laws Ann. tit. 31, § 5298. We find Rodriguez’s argument unpersuasive for at least two reasons.
 

 First, even if a one year statute of limitations did apply, Lopez’s action was timely. As Rodriguez himself concedes, the available time for filing against him
 
 *939
 
 could not have begun to run until Lopez knew or had reason to know of the injury which is the basis for this action. Brief of Defendant-Appellant at 20. Lopez did not even replace Rodriguez as trustee until September of 1983.
 
 [9]
 
 Moreover, as the district court found based on Lopez’s testimony, Rodriguez delayed turning over the hotel records until January of 1984, and, when he did, the records were incomplete and in disarray, requiring until June of 1984 to organize and to determine what was missing. 71 B.R. at 426. Throughout this period, the court found that Rodriguez attempted to conceal material information from Lopez, the bankruptcy court and the creditors. Rodriguez has provided no basis, and we have found none, for overturning these factual findings by the district court. The May 1985 filing date of this action thus falls only eleven months after the earliest possible date at which Lopez could reasonably be said to have had knowledge of Rodriguez’s alleged wrongdoing.
 

 Second, for the reasons that follow, we reject Rodriguez’s contention that personal liability actions against a bankruptcy trustee can be time-barred before the trustee has presented a final account to the bankruptcy court and been discharged. In the present case, Rodriguez did not file his final report, styled an “Application for Final Compensation,” until June 10, 1986, more than a year after this action was instituted.
 
 See
 
 Appendix B to the district court’s opinion, 71 B.R. at 442-45. At the time of this appeal, the application still had not been approved nor Rodriguez discharged.
 

 There is no explicit provision in the Bankruptcy Code prescribing a period of limitations for actions against trustees in their personal capacity. A fair reading of the code as a whole, however, leaves no doubt that a trustee cannot be released from liability before discharge. To begin with, section 704 of the code, in setting out the duties of a trustee, provides that they “shall ... make a final report and file a final account of the administration of the estate with the court.” 11 U.S.C. § 704(9). In practice, this provision means:
 

 The trustee must file an itemized statement of property received and disposed of. The purpose of all expenditures must likewise be stated. In the case of private sales of property the trustee is also required to keep an accurate and itemized account of all property sold, of the price received therefor and to whom sold. His account should deal only in dollars and cents and his report should be a running summary of the details of the administration_ The trustee’s reports and accounts should be filed with the Bankruptcy Judge and with the United States Trustee in those districts incorporated into the United States trustee system. The reports and accounts are then submitted to creditors at the final meeting of creditors, and, if passed by them, are approved, and the trustee accordingly discharged of his trust by court order.... Where the trustee has filed his final report and account for settlement, and after due notice, the report and account is approved and the trustee discharged, the bankruptcy court has no further jurisdiction to enter an order against him surcharging him for money not distributed to a creditor.
 

 4
 
 Collier on Bankruptcy
 
 11704.12, at 704-26.1 to 28 (L. King 15th ed. 1988);
 
 see also 2 Collier, supra,
 
 ¶ 350.02, at 350-6 (“When there has been full administration, the trustee should be discharged and the case closed under section 350(a).”). The very purpose of a final accounting is to insure that trustees disclose and be held accountable for their handling of the estate. Therefore only
 
 after
 
 having done so can they be absolved of liability.
 

 This understanding of a trustee’s obligations is confirmed by section 322(d) of the code, which provides that “a proceeding on a trustee’s bond may not be commenced
 
 *940
 
 after two years after the date on which such trustee was discharged.” Lopez contends that we should apply this provision directly to Rodriguez in order that Rodriguez not benefit from the fact that he failed to post bond. Rodriguez, on the other hand, distinguishes section 322(d) on the ground that it applies only to actions against the insurance company acting as surety, not to actions against the trustee personally. We can see merit in the arguments of both sides, but we do not feel compelled to reach the issue of whether section 322(d) applies to trustees at this time. Rather, we think it is sufficient to note that section 322(d), like the provisions cited above, focuses on discharge as the point at which the period of limitations
 
 begins
 
 to run. Having never been discharged, Rodriguez’s financial accountability as a trustee cannot have ceased.
 

 Rodriguez argues that by adopting this rule we will discourage qualified persons from becoming bankruptcy trustees. Pointing to the fact that he still has not received a judicial discharge although his term as trustee ended in 1983, Rodriguez claims that trustees will be exposed to lawsuits for “excessively prolonged” and “indefinite” periods. But in
 
 Mosser
 
 the Supreme Court has already answered this contention, noting that the way for trustees to avoid uncertainty about personal liability is to seek instructions from the bankruptcy court on difficult questions of judgment and to file periodic accounts with the court. 341 U.S. at 274-75, 71 S.Ct. at 683-84;
 
 see also
 
 11 U.S.C. § 704(8) (“if the business of the debtor is authorized to be operated, [the trustee shall] file with the court ... periodic reports and summaries of the operation of such business, including a statement of receipts and disbursements, and such other information as ... the court requires”). Once there has been “candid disclosure” to the court and creditors, and the court approves the action, the trustee will be immunized from personal liability.
 
 Mosser,
 
 341 U.S. at 274, 71 S.Ct. at 683.
 

 III. LIABILITY FOR PARTICULAR SURCHARGED ITEMS
 

 Rodriguez attacks the individual items surcharged on both factual and legal grounds. With respect to Rodriguez’s arguments concerning factual findings, we begin by noting that our review is limited to a determination of whether the district court’s findings are clearly erroneous. Fed.R.Civ.P. 52(a). “A finding is clearly erroneous only if, after reviewing the entire record, the appellate court ‘is left with the definite and firm conviction that a mistake has been committed.’ ”
 
 Scarpa v. Murphy,
 
 806 F.2d 326, 328 (1st Cir.1986) (quoting
 
 Anderson v. Bessemer City,
 
 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed. 2d 518 (1985);
 
 United States v. United States Gypsum Co.,
 
 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948);
 
 SEC v. MacDonald,
 
 725 F.2d 9, 11 (1st Cir.1984)). The record in this case reveals conflicting testimonial and documentary evidence relating to Rodriguez’s actions, which is susceptible to divergent reasonable interpretations by a fact finder. On appellate review, however, the rule is that “[w]here there are two permissible views of the evidence, the factfinder’s choice between them cannot be clearly erroneous.”
 
 Anderson,
 
 470 U.S. at 574, 105 S.Ct. at 1511. Moreover, “ [findings based on witness credibility are lodged firmly in the province of the trial court, and we are loathe to disturb them absent a compelling showing of error.”
 
 Scarpa,
 
 806 F.2d at 328;
 
 Apostol v. United States,
 
 838 F.2d 595, 598 (1st Cir.1988).
 

 We thus look with a jaundiced eye on Rodriguez’s suggestion that we question the credibility of Kagan, Lopez’s main witness, because he is a “disgruntled” former employee dismissed by Rodriguez. This same argument was put to the district court and soundly rejected. Acknowledging Kagan’s potential bias, the court below “carefully scrutinized Kagan’s testimony” and determined that it was credible. 71 B.R. at 420 n. 5. Beyond observing Kagan’s demeanor as a witness, the court compared the substance of Kagan’s testimony with a myriad of contemporaneous memoranda and found it overwhelmingly corroborated by the documents. The court also noted that Rodriguez presented no evi
 
 *941
 
 dence that the advice Kagan set forth in his memoranda was unsound.
 
 Id.
 
 Indeed, particular incidents demonstrating Rodriguez’s respect for Kagan were indentified, including one occasion in May of 1982 when Rodriguez solicited Kagan’s advice concerning another hotel with which he was involved.
 
 Id.
 
 Having reviewed the record, we have found no basis for overturning the district court’s well-supported conclusion that Kagan was credible.
 

 Before turning to specific surcharges, a final preliminary note is in order: we have found as well no basis for overturning the district court’s general conclusion that Rodriguez intentionally breached his fiduciary duties. Even in addition to the items discussed below, the record is replete with instances where Rodriguez acted against advice to the detriment of the estate, failed to adequately account for and/or concealed his actions, and garnered personal financial benefit through his position of trust. Our detailed discussion here, however, is reserved for the particular charges underlying the multimillion dollar judgment. For each, we look for evidence both of an intentional breach of duty and of a resultant loss to the estate. The surcharges are examined in the order in which they appear in the district court opinion.
 

 A.
 
 Pay Raise for the Hotel Workers
 

 On May 30, 1980, the day before Rodriguez was appointed as trustee and at a point in time when the hotel itself was debtor in possession, an application was filed with the bankruptcy court to reject an existing collective bargaining agreement between the hotel and Local 610 of the Gastronomical Workers Union.
 
 [10]
 
 Local 610 represented the bulk of the hotel’s employees. The stated reason for requesting rejection of the collective bargaining agreement was that the agreement had become “onerous and burdensome” to the hotel, because, among other things, it required the hotel to employ unnecessary employees and called for substantial pay raises the hotel could not afford.
 
 [11]
 
 Once Rodriguez became trustee, he was informed of the application to reject, and he undertook to negotiate a new agreement with Local 610.
 

 Kagan testified that he discussed the status of the agreement and the financial affairs of the hotel with Rodriguez before Rodriguez began negotiating. He stated that he informed Rodriguez that certain cost-cutting measures, including rejecting the pay raises in the agreement, were crucial to the hotel’s future. To this Rodriguez reportedly replied that he would not “sign any contract with the union that gives them an increase or limits our job flexibility.” Kagan’s testimony in this regard is specifically corroborated by contemporaneous memoranda sent to Rodriguez wherein he detailed the hotel’s precarious financial condition and especially noted the importance of lowering payroll costs by rejecting the pay raises for Local 610. Nevertheless, on October 30, 1980, Rodriguez entered into a stipulation with Local 610 granting the union members almost exactly the same pay raise they would have received under the collective bargaining agreement. On December 3, 1980, the bankruptcy court approved the stipulation.
 

 Finding that Rodriguez granted the pay raises “without any logical explanation,” 71 B.R. at 421, the district court surcharged Rodriguez $1,260,000 for the cost to the estate of the pay raises. This figure was derived from Kagan’s testimony that the base payroll for the hotel was approximate
 
 *942
 
 ly $6,000,000 and that Rodriguez granted two consecutive yearly seven percent pay raises.
 
 [12]
 
 For 1981, the year of the first pay raise, the estate paid an extra seven percent of $6,000,000 or $420,000. For 1982, Kagan said, the hotel paid that same $420,000 again, plus an additional $420,000 for the second pay raise. Kagan also testified that Rodriguez agreed to a third twelve percent raise to begin in 1983, but, because the hotel closed immediately after it went into effect, the loss was minimal.
 

 Rodriguez contends that the district court clearly erred in finding that he intentionally breached his fiduciary duty in agreeing to the pay raise. We disagree. The evidence amply supports the court’s finding that Rodriguez acted contrary to sound advice and to the detriment of the estate in approving pay raises which the estate already had acted to reject. In combination with Rodriguez’s other actions, we think this evidence is consistent with the conclusion that Rodriguez acted intentionally in approving the raises, in order to placate workers and to prolong the administration of the estate and the financial benefits accompanying that administration. The fact that Rodriguez can draw a contrary inference from this and other evidence is irrelevant; the question before us is only whether the inference the fact finder chose to draw was clearly wrong, and we think it was not.
 

 Rodriguez also claims that he is immune from liability for the pay raises because the stipulation he negotiated was approved by the bankruptcy court. As a general matter, as we have already discussed in the context of the
 
 Mosser
 
 case, we agree with Rodriguez that a trustee acting with the explicit approval of a bankruptcy court is entitled to derived judicial immunity.
 
 See
 
 page 940
 
 supra; see also, e.g., Lonneker Farms, Inc. v. Klobucher,
 
 804 F.2d 1096, 1097 (9th Cir.1986). But as we have also said, such judicial immunity is contingent upon “candid disclosure” to the court and the creditors of the relevant circumstances surrounding the proposed action.
 
 See Mosser,
 
 341 U.S. at 274, 71 S.Ct. at 683. Only after such disclosure has been made, and the court is aware of the pertinent facts, does judicial approval become meaningful. Here, Rodriguez has been surcharged precisely because he did not disclose, because he presented to the court as part of a plan of reorganization a stipulated pay raise that he knew was unworkable. We will not permit Rodriguez to shelter under the protective mantle of judicial immunity when he intentionally failed to disclose the obvious and fatals flaws in the action for which he sought approval.
 

 Rodriguez’s final challenge to the pay raise surcharge is a mathematical one. Although conceding that the court’s use of a $6,000,000 payroll base and two seven percent pay raises is “correct,”
 
 [13]
 
 Rodriguez argues that the resultant surcharge should be $869,400, not $1,260,000. Rodriguez agrees with the court that a seven percent pay raise in 1981 created additional 1981 payments of $420,000. For 1982, Rodriguez says, this $420,000 should be added to the base of $6,000,000 yielding $6,420,000; and seven percent of $6,420,000 is $449,400. Adding $420,000 for 1981 and $449,400 for 1982, Rodriguez asserts that $869,400 is the correct surcharge. But Rodriguez conveniently overlooks the fact that for 1982 the estate must have paid
 
 both
 
 the original 1981 pay raise (still effective) of $420,000 and the 1982 addition of $449,000. The total for the two years is thus $1,289,400. In using the sum $1,260,000, the district court was overgenerous to Rodriguez because it neglected the compounding effect of consecutive yearly pay raises. Lopez, however, has not challenged the sum on this or any other ground, and so we let the surcharge of $1,260,000 stand.
 

 
 *943
 
 B.
 
 Casino Workers’ Back Pay Award For Being Illegally Fired
 

 The basis for this surcharge was summarized in this way by the district court.
 

 In addition to the mentioned collective bargaining agreement with the Gastronomical Workers Union, Local 610, the hotel had a second collective bargaining agreement with the casino union, known as “Union de Empleados de Casinos de Puerto Rico.” It was obvious, and Ka-gan had so advised, that the casino contract had to be rejected to save approximately $1 Million a year. Rodriguez Estrada failed to follow said recommendation. About a year elapsed. The pressure mounted and, finally, in the summer of 1981, the trustee proceeded to reject the casino collective bargaining agreement. The trustee’s post-rejection actions regarding the union were erratic. He failed to consistently implement the rejection, thereby causing extreme labor unrest which ultimately resulted in a strike of the casino workers. The strike lasted until the hotel closed in 1983. During the course of his dealings with the casino workers, defendant Rodriguez Estrada unlawfully fired the striking workers, against the advice of counsel. The National Labor Relations Board determined that he had indeed incurred in unfair labor practices and ordered the workers’ reinstatement with back pay. Testimony received by the court estimated the back pay to be approximately $1 Million.
 

 71 B.R. at 421. Because the exact amount that the estate would have to pay out in back pay was uncertain at the time of trial, the district court held Rodriguez liable for “[a]ny amount up to $1 Million which the bankruptcy court may allow in the future under Chapter 7 liquidation proceedings to the casino workers illegally fired.”
 
 Id.
 
 at 427.
 

 Rodriguez raises a myriad of challenges to this surcharge, the most substantial of which is that the district court clearly erred in finding a deliberate breach of fiduciary duty. To support this, Rodriguez relies primarily on the lengthy opinion of an NLRB administrative law judge (ALJ) in which the hotel’s liability was established.
 
 See San Juan Hotel Corp.,
 
 No. 24-CA-4663 (NLRB Div. of Judges May 3, 1983), reprinted in Appendix at 97-145.
 
 [14]
 
 According to Rodriguez, the AU’s opinion establishes that his decision to fire, while illegal, was a legitimately mistaken judgment call, not an intentionally wrongful act. The gist of the opinion, which is too long to completely summarize here, is that: (1) Rodriguez was justified in rejecting the contract with the casino workers, an action that had been authorized by the bankruptcy court; and (2) Rodriguez was justified in firing one worker for distributing certain leaflets —an event precipitating the strike — and in replacing workers once they went on strike; but (3) the casino workers had engaged in a protected strike over economic conditions and it was improper for Rodriguez to have discharged the striking workers
 
 before
 
 replacing them. The AU thus ordered the discharged workers reinstated and held the hotel liable for back pay.
 

 Even were we to assume that all the ALJ’s factual and legal findings were bind
 
 *944
 
 ing on the district court, we do not think that they establish clear error in the district court’s finding. We see two major factors underlying the district court’s conclusion to surcharge Rodriguez. First, Rodriguez delayed seeking rejection of the casino workers’ agreement, and then, once rejection was sought and approval granted by the bankruptcy court, Rodriguez acted erratically and inconsistently in implementing the rejection. The evidence on this point is ample and convincing, coming from Kagan’s testimony, from contemporaneous Kagan memoranda and, indeed, from the AU’s opinion. For instance, the evidence shows that at a number of points after rejection, Rodriguez unilaterally imposed changes in the casino workers’ hours, pay and benefits, only to change them again a few months later. These repeated and unpredictable changes fueled discontent and dissension among the workers and undoubtedly contributed to their decision to strike.
 

 Second, there is evidence that Rodriguez was advised by his attorneys not to fire the casino workers, but ignored that advice and did so.
 
 [15]
 
 Such evidence, we think, not only shows that Rodriguez acted recklessly in disregard of the estate’s well being, but also supports the inference that his actions were intentional. Importantly, neither of these points is in any way refuted by the AU’s opinion, which only establishes that in some other respects Rodriguez’s actions were proper, at least in terms of complying with applicable labor laws. We find no clear error in the district court’s factual finding.
 

 Rodriguez’s remaining complaints about this surcharge relate to the form of contingent liability imposed by the district court. For instance, Rodriguez says that the establishment of a one million dollar ceiling on his liability is unacceptably speculative because it was based solely on Ka-gan’s testimony that he did not know the exact amount of damages imposed by the NLRB, but thought it was “in the millions.” We acknowledge, as did the district court, that this damage estimate was somewhat speculative. But we also repeat what we have said earlier, namely, that
 
 Mosser
 
 surcharges may be estimated where the exact amount of damage cannot be calculated. Moreover, we think that Rodriguez is in no position to complain about the
 
 ceiling
 
 on his liability in the first place. Under the district court’s ruling, Rodriguez will only be held liable for the amount of money that the estate actually pays out to the fired workers. To the extent that this liability does not reach one million dollars, the ceiling will be irrelevant to Rodriguez. To the extent the liability exceeds one million dollars, the ceiling will serve only to protect Rodriguez from an additional surcharge for which he might legitimately be held accountable. Thus, even if one million dollars is a wholly speculative and unsubstantiated figure, it can only work to harm the estate which may be forced to pay out more than it can recoup from Rodriguez.
 

 For similar reasons, we reject Rodriguez’s related complaint that this surcharge is too speculative because the hotel’s back pay liability is joint and several with a union. Under the district court formula, Rodriguez will only be surcharged for the amount the hotel actually pays. The fact that a union might also have to pay a portion of the liability is irrelevant.
 

 It is well-established that a judgment like this one, involving contingent liability, can be a proper, final and appealable one so long as it “fixes [the defendant’s] liability and clearly establishes the parameters of that liability.”
 
 Hattersley v. Bollt,
 
 512 F.2d 209, 213 (3d Cir.1975) (citing
 
 Gillespie v. United States Steel Corporation,
 
 379 U.S. 148, 152, 85 S.Ct. 308, 311, 13 L.Ed.2d 199 (1964));
 
 see also
 
 9 J. Moore, B. Ward &
 
 *945
 
 J. Lucas,
 
 Moore’s Federal Practice
 
 11110.12 (2d ed. 1987 & Cum.Supp.1987-88). The district court’s judgment fully complies with this standard, establishing Rodriguez’s liability and setting forth a plain and easily administered formula for calculating the amount of that liability.
 

 In a last ditch effort to prevent our affirming this surcharge, Rodriguez suggests that the district court’s decision may not be final for another reason: although the opinion and order of the district court sets forth the surcharge, the actual judgment entered by the district court does not mention the contingent back pay liability. Rodriguez terms this a violation of Rule 58 of the Federal Rules of Civil Procedure, which mandates that “[e]very judgment shall be set forth on a separate document.” Here, Rodriguez says, there is no separate document declaring his liability for back pay. We are not convinced that there has been a violation of the separate judgment rule.
 

 The relevant portion of the district court judgment, which indisputably appears on a separate document, reads: “Based on the court’s opinion and order entered today, judgment is hereby entered on behalf of [Lopez] and against [Rodriguez] in the amount of $3,434,081.82, plus costs.” It is true, of course, that the judgment explicitly mentions the $3,434,081.82 attributable to the eleven immediately quantifiable surcharges, and not the contingent back pay liability. But this seems unimportant given that the judgment also references the opinion and order which does explicitly set out the back pay surcharge. Importantly, the opinion and order discusses the back pay surcharge in the same way the other eleven surcharges are discussed and, at the end of the order, summarizes the twelve in an indistinguishable manner, indicating that the court viewed all twelve surcharges as equally final.
 

 Finally, even if there was a technical violation of Rule 58, the fact that both parties filed timely notices of appeal and that they have extensively argued this point on appeal demonstrates that neither was prejudiced by the violation; Rodriguez’s right to claim a lack of compliance with Rule 58 therefore has been waived.
 
 See Bankers Trust Co. v. Mallis,
 
 435 U.S. 381, 98 S.Ct. 1117, 55 L.Ed.2d 357 (1978);
 
 Harris v. McCarthy,
 
 790 F.2d 753, 756-57 (9th Cir.1986);
 
 Diamond v. McKenzie,
 
 770 F.2d 225, 230-31 (D.C.Cir.1985). The contingent surcharge for casino workers’ back pay is affirmed.
 

 C.
 
 Unpaid Union Dues
 

 The third surcharge imposed by the district court was $94,094 for unpaid union dues owed by the estate to Local 610 of the Gastronomical Workers Union. Under the collective bargaining agreement with Local 610, the hotel was obliged to deduct these union dues from member-employees’ paychecks and then to turn them over to the union. But the district court found that Rodriguez was chronically late in paying over the dues, and that by February of 1982 he stopped paying altogether. Moreover, Rodriguez failed to return phone calls from the union inquiring about the payments and also failed to turn over required payroll records to the union. Finding that Rodriguez breached his fiduciary duty by these actions, the district court held him liable for the total unpaid dues.
 

 On appeal, Rodriguez does not challenge the factual findings by the district court underlying this item, but asserts that the estate suffered no loss as a result of his actions. Only the union itself has been harmed, he says, because it did not receive the dues to which it was entitled. Reluctantly we agree. Although the impropriety of Rodriguez’s actions seems plain enough, the district court’s opinion also makes it clear that the harm underlying this surcharge was harm to the union, not the estate: “The Gastronomical Workers Union, Local 610, was also seriously affected by the trustee’s failure to report or by the concealment of material information. The Union’s pension fund lost $94,094 in dues.” 71 B.R. at 422. But the union is not a party to this action, and neither the district court nor Lopez has articulated any way in which Rodriguez’s failure to pay has
 
 *946
 
 harmed the estate.
 
 [16]
 
 Nor has it been established that Rodriguez or anyone under his control personally profited from the unpaid dues.
 

 If anything, the evidence shows that the estate benefitted, albeit illegitimately, by remaining in possession of the $94,094. Even if the union eventually is able, through the liquidation proceedings, to collect from the estate the full $94,094 it is owed, the estate will be no worse off than if Rodriguez himself had paid the union the money. And for us to have Rodriguez now throw another $94,094 into the estate, which would then be divided among all creditors, would only marginally benefit the union, if at all. As we discussed in Part II.A.
 
 supra,
 
 the only proper course by which the union can seek to be made whole is a direct action against Rodriguez. The surcharge of $94,094 for unpaid union dues must be reversed.
 

 D.
 
 Local Taxes
 

 Union dues were not, alas, the only debts of the estate that went unpaid. The district court also received evidence that Rodriguez deliberately failed to pay taxes, both Commonwealth and federal. With respect to Commonwealth taxes, the court found not only that Rodroguez failed to pay almost two million dollars in employee’s withholding tax, personal property tax and excise tax, but also that he entered into a tax exemption and payment plan with the Commonwealth when he knew the estate could not comply with it. 71 B.R. at 422. The court surcharged Rodriguez for $461,-353.66, representing interest and penalties incurred by the estate as a result of the failure to pay.
 

 In this respect, the district court complied with the normal rule for trustee surcharges:
 

 The trustee has the affirmative duty of seeking out and paying all taxes accruing against the estate during bankruptcy; if he fails to do so, having sufficient funds in hand to pay them, and thus subjecting the estate to interest and penalties, he may be surcharged to the extent of the interest and penalties.
 

 4
 
 Collier, supra,
 
 If 704.04, at 704-11 to 12. Rodriguez does not challenge this legal proposition, but does argue that the district court’s factual finding was, for a number of reasons, clearly erroneous.
 

 The relevant trial evidence on unpaid Commonwealth taxes was provided by Ruth Fonseca Benitez (Fonseca), an employee of the Puerto Rico Department of Treasury who had monitored the San Juan Hotel’s taxes. Referring to a January 29, 1987 Department of Treasury certification, Fonseca summarized the estate’s tax liability as follows:
 

 Principal Owed Interest Penalty
 

 Income Withholding Tax $ 772,941.86 $221,993.37 $ 73,094.50
 

 Personal Property Tax 156,470.01 52,725.02 14,090.28
 

 Excise Tax 353,525.13 60,533.31 38,917.18
 

 Total $1,282,937.00 $335,251.70 $126,101.96
 

 Combining penalties and interest for the three taxes yields $461,353.66, the amount surcharged by the district court.
 
 [17]
 

 
 *947
 
 Rodriguez contends that Fonseca’s testimony is an unreliable guide to the amount of tax the estate owes because the figures she presented do not take into consideration the tax exemptions to which the estate was entitled. Although there appears to be an ongoing dispute between the estate and the Commonwealth concerning whether these tax exemptions are still valid in the face of the estate’s failure to pay what it owed, the exemptions originally covered part of both the real and personal property taxes for the period at issue. Failure to consider the exemptions thus might have led to an overstatement of the estate’s tax liability. But the factual premise underlying Rodriguez’s argument is itself mistaken: Fonseca’s testimony did take into consideration the tax exemption. Despite an attempt by Rodriguez’s counsel to create the contrary impression by bringing out on cross-examination that Fonseca did not receive information about exemptions from an “official source,” the following was elicited on redirect examination:
 

 Q: Miss Fonseca, isn’t it a fact that the balances due which you have reported to the Court today were calculated taking into consideration the tax exemption that was granted to the San Juan Hotel Corporation?
 

 A: Yes, sir.
 

 Rodriguez also misconstrues Fonseca’s testimony in another way; he suggests that the figures she testified to are unreliable because when testifying she did not have before her the official certification concerning outstanding taxes. But the “I don’t have it with me” statement on which Rodriguez relies to support this argument, taken in proper context, refers to a request for information about a tax exemption, not to the certification. Moreover, we think it obvious from the precise figures she supplied that Fonseca had in her possession some document detailing the estate’s tax liability.
 

 As a fallback position, Rodriguez asks that we discredit Fonseca’s testimony even if the certification was present because the certification itself was never put into evidence. Rodriguez suggests now, for the first time, that Fonseca’s oral recounting of the figures was inadmissible hearsay. But Rodriguez offers no argument or authority for why the admission of Fonseca’s testimony — even if erroneous — constitutes “plain error affecting substantial rights” which would justify our consideration of an evidentiary objection never presented to the trial court for a timely ruling. Fed.R. Evid. 103(a), (d). We find no plain error and further find that Fonseca’s testimony more than adequately supports the district court’s finding. The surcharge for local taxes will stand.
 

 E.
 
 Federal Taxes
 

 The district court also found that Rodriguez deliberately failed to pay to the federal government money which the estate owed for payroll-related taxes. The evidence on this point was particularly damaging to Rodriguez because it established that he paid to the government, through restrictively-endorsed checks, only the withheld portion of payroll taxes for which he might be held personally liable under 26 U.S.C. § 6672,
 
 [18]
 
 but not the employer’s portion of the taxes. Rodriguez thus protected himself while leaving the estate exposed to additional liability for interest and penalties.
 

 Rodriguez does not attack the evidence underlying the district court’s finding of deliberate violation of fiduciary duty, and we accept it. It would have been proper, therefore, for the court to have surcharged Rodriguez for the penalties and interest assessed against the estate on account of Rodriguez’s failure to pay. But, instead of
 
 *948
 
 that, the court surcharged Rodriguez $1,240,464.22, representing the principal of tax owed as well as penalties and interest. By way of explanation, the court said:
 

 In the case of taxes due and owing to the Commonwealth of Puerto Rico, we adhere to the general rule of surcharging only penalty and interest. In the case of payroll-related taxes (FICA-FUTA), payable to the Internal Revenue Service, we assess the total post-petition obligation. The trustee had the money to pay and he deceived the Federal Government.
 

 71 B.R. at 427 n. 11. We are at a loss to understand the court’s reasoning and its proffered distinction between failure to pay Commonwealth as opposed to federal taxes. With respect to both, the court found —as it must have,
 
 see
 
 4
 
 Collier, supra,
 
 11704.04, at 704-11 to 12,
 
 quoted supra
 
 at 946 — that Rodriguez intentionally failed to pay the taxes when the estate had the resources to do so. Even if Rodriguez were somehow conceptually
 
 more
 
 culpable for his failure to pay federal taxes than Commonwealth taxes, it would not justify surcharging him for a loss not suffered by the estate. As we have said, the purpose of a surcharge is to benefit creditors, not to punish trustees.
 

 The district court here did not articulate any way in which the principal of federal tax owed represents a loss to the estate. Indeed, we find it implicit in the court’s statement that the federal government was “deceived,” that the court was concerned with harm to the government, not the estate. But the government’s harm is compensated for by the imposition of penalties and interest, for which Rodriguez is liable. Moreover, the government, as a creditor, can sue Rodriguez directly for harm caused.
 

 Defending the district court’s judgment, Lopez suggests that even the principal of tax owed represents a loss to the estate in that “Rodriguez needlessly incurr[ed] the taxes as a first priority expense.” Brief for the Appellee at 44. We take this to mean that, because he continued to operate the hotel after it became clear that reorganization was not feasible, Rodriguez should be held responsible for the hotel’s continuing expenses for that period, including labor costs such as payroll taxes. But this argument proves too much and conflicts with the theory of the case espoused by Lopez below. Although he might have, Lopez did not proceed in this case on the theory that Rodriguez’s failure to convert to liquidation proceedings exposed him to
 
 Mosser
 
 liability for the total net loss of the hotel during attempted reorganization. Instead, Lopez attempted to identify and prove discrete harms caused by Rodriguez and argued that Rodriguez should be held liable for those. We will not at this late date permit Lopez to switch theories, arguing on the one hand that Rodriguez should be surcharged for discrete losses and yet, where proof of discrete loss is lacking, also arguing that Rodriguez is liable for
 
 any
 
 expense borne by the estate during reorganization. Rather, as with the taxes owed the Commonwealth, Rodriguez can be surcharged only for the penalties and interest owed to the federal government, which represent the identifiable discrete losses to the estate established by Lopez.
 

 To calculate the outstanding penalties and interest attributable to Rodriguez’s failure to pay federal taxes, we turn to the relevant evidence relied upon by the district court for its calculations: the testimony of Jorge Manrique, an Internal Revenue Service (IRS) official, and two tax liability schedules compiled by the IRS, which were admitted into evidence.
 
 [19]
 
 Each of the tax schedules breaks down the estate’s taxes by financial quarter, and contains columns identifying the relevant assessments, payments, penalties and interest attributable to each quarter. The first schedule, plaintiff’s exhibit 258, sets out the original tax assessments, while the second, plaintiff’s exhibit 259, sets out additional deficiencies determined by the IRS. By adding together the total balances due noted on each schedule, but omitting the portion attribut
 
 *949
 
 able to periods before Rodriguez became trustee,
 
 [20]
 
 the court arrived at the figure of $1,240,464.22. By similarly referring to the two schedules, but adding together only penalties and interest for the applicable periods, we arrive at the figure of $388,785.44.
 
 [21]
 

 Rodriguez, however, argues that these exhibits are unreliable and inconsistent with other evidence introduced. In particular, Rodriguez claims that the IRS tax liability schedules do not exactly correspond with certain tax returns filed by the estate and do not reflect all payments made by the estate to the IRS through restrictively-endorsed checks. This argument must be rejected. Manrique, the IRS official, testified at trial that the tax schedules represented a compilation of all pertinent IRS internal records, including filed tax returns. Moreover, Manrique noted that all payments received by the IRS, including payments for penalties, were reflected on the schedules, although he could not “specifically say what amount was applied to what periods” on the schedule. The schedules thus reflect only amounts still owed to the IRS. Rodriguez’s argument is simply an attack on the credibility of this testimony, which the district court obviously did find credible. We find no clear error in the court’s decision to rely on the Manrique compilations rather than the fragmentary numbers to which Rodriguez now points.
 

 Rodriguez’s further assertion that the estate cannot seek to surcharge him for taxes because it has not contested and litigated its tax liability with the IRS is merit-less. Through Manrique, the estate has presented detailed and documented computations of the estate’s debt to the IRS. These more than satisfy the specificity requirements of a
 
 Mosser
 
 surcharge. Rodriguez will be surcharged $388,785.94 for penalties and interest stemming from his failure to pay federal payroll taxes.
 

 F.
 
 Casino Accounts Receivable
 

 The district court set forth this description for its sixth surcharge, in the amount of $273,832.94.
 

 During his tenure as Chapter 11 trustee, the defendant wrote off, or approved the writing off, of certain casino accounts receivable which secured debtor’s loan by Banco Popular of Puerto Rico. The trustee failed to give notice to the bank or any other creditor of the estate. After the proceeding was converted to a Chapter 7 liquidation, Banco Popular discovered that $273,832.94 in accounts receivable, constituting part of the bank’s security for the loan, could not be accounted for by the trustee. Defendant’s actions in writing off these accounts receivable without notice to creditors and the secured creditor constitutes a breach of defendant’s fiduciary duties. In this sense, he failed to properly account for all property received by him as trustee.
 

 71 B.R. at 422-23.
 

 Before discussing the merits of this surcharge, a point of clarification is necessary. Although the court refers to Rodriguez’s action as “writing off” the accounts receivable which served as collateral for Banco Popular’s loan, Banco Popular’s claim— which was the basis for the court’s action— was actually that Rodriguez
 
 collected
 
 the money owed and then failed to turn it over to the bank, not that he wrote it off as uncollectable. This is evident in testimony by a Banco Popular vice president that “collections had been made by the hotel which were not forwarded to the bank.”
 
 *950
 
 The same official also described the documentation underlying the bank’s claim for $273,832.94 in this way:
 

 This is the final summary of the accounts that were being assigned to Banco Popular being held by the San Juan Hotel which showed the differences in balances which we alleged are collections.
 

 The $273,832.94 figure thus is not an amount which Rodriguez is alleged to have written off; it is the amount the estate is said to owe the bank because Rodriguez already collected it from the casino debtors.
 

 With that clarification, it becomes, we think, clear that the surcharge cannot stand. As with the unpaid union dues and the federal tax principal, the loss underlying this surcharge was a direct loss to a particular creditor (Banco Popular), not a loss to the estate. If anything, the evidence shows that the estate benefitted as a result of receiving the collection proceeds, since they properly belonged to the bank. There is no evidence that Rodriguez personally profited from the collections. Even accepting the court’s conclusion that Rodriguez violated a duty owed to the bank, that finding forms only the basis for a direct action against Rodriguez by Banco Popular.
 

 We acknowledge that the estate might have suffered a loss if Rodriguez actually had
 
 improperly
 
 written off some of these debts. In that case, the estate would have lost a legitimate and collectable claim against the casino debtor while still remaining liable to the bank for that same amount. But we have no evidence before us that any of the $273,832.94 represents improper write-offs of collectable debts.
 
 [22]
 
 The surcharge is reversed.
 

 G.
 
 Personal Use Items
 

 Although evidence at trial pointed to a number of ways in which Rodriguez derived personal gain through his position as trustee, the district court surcharged him for only two: $15,000 for the remodeling of the Presidential Suite which Rodriguez occupied, and $6,000 for the cost to the estate of Rodriguez’s daughter’s wedding reception.
 
 [23]
 
 71 B.R. at 423. We find substantial evidence in the record to support both surcharges, which we affirm.
 

 Kagan testified regarding the basis for both surcharges. With respect to the remodeling of the Presidential Suite, he testified: that Rodriguez personally used the suite “on occasion” and also approved of its complimentary use by others; that at one point in his trusteeship, Rodriguez took possession of the keys to the suite and denied access to all others; that Rodriguez authorized the redecoration of the suite; and that Kagan knew the cost of redecoration to be between $15,000 and $20,000 because he saw the bills. With respect to the wedding reception, Kagan testified: that Rodriguez held a reception at the hotel for about two hundred guests; that the total billing at regular hotel prices would have been approximately $12,000; and that Rodriguez issued instructions that he should be given a fifty percent discount and that he eventually paid a little under six thousand dollars.
 

 As the district , court noted, this sort of self-dealing by a trustee is the quintessence of a conflict of interest. A surcharge was thus wholly appropriate. Rodriguez, however, raises a number of objections to the surcharges which range from the meritless to the facetious. For instance, Rodriguez argues that he should not be surcharged for the full cost of re
 
 *951
 
 modeling because there was no evidence that he personally had “exclusive” use of the facilities. Rodriguez suggests, in essence, that Lopez should have established Rodriguez’s percentage of occupancy of the room and only sought to surcharge him for that portion of the total cost. Rodriguez also asserts that remodeling did not harm the estate because the money spent increased the value of the Presidential Suite and thus of the whole hotel. We think that these are precisely the kinds of difficult fact-finding inquiries the necessity of which the Supreme Court rejected in
 
 Mosser. See
 
 discussion in Part II.A.
 
 supra.
 
 The evidence shows overwhelmingly that Rodriguez violated his fiduciary duties by redecorating and using the Presidential Suite; $15,000 is an entirely reasonable and, if anything, overly conservative estimate of resultant loss to the estate.
 

 Rodriguez raises similarly frivolous objections to the $6,000 wedding reception surcharge, asserting, among other things, that there was no harm to the hotel because Lopez did not establish that “the Hotel had other available business to substitute the wedding of Rodriguez’s daughter.” Brief of Defendant-Appellant at 56. Rodriguez also points out that Kagan’s figures for the wedding cost — on which the district court relied — vary slightly from those presented by another hotel employee, who estimated the cost to be approximately $10,000 to $11,000, and from Lopez’s testimony that Rodriguez paid $5,000 for the wedding. In the context of a
 
 Mosser
 
 surcharge, where the exact figures are not available, we think that the district court’s use of $6,000 was also an entirely reasonable estimate of the estate’s loss. The surcharges are affirmed.
 

 H.
 
 Dinner Boxing Show Losses
 

 The evidence shows that during Rodriguez’s time as operating trustee, three separate dinner boxing show events were staged, each resulting in a loss to the hotel. Finding that Rodriguez’s approval of these events was a deliberate breach of his fiduciary duty, the district court surcharged him for the total estimated losses: $30,987.
 
 [24]
 
 71 B.R. at 428, 428. The court identified two factors supporting its conclusion that Rodriguez acted wrongfully: first, that after the first boxing show posted a loss of $10,987, Kagan advised Rodriguez that no more shows should be held, but Rodriguez ignored this advice and approved two more events; and, second, that Rodriguez issued numerous complimentary tickets to each event.
 

 With respect, we find that the district court’s conclusion is not supported by the evidence, and must be reversed even under the clearly erroneous standard, for the following reasons. First, with respect to Rodriguez’s decision to stage these events against Kagan’s advice after the loss from the first event, we think it obvious that at best this makes wrongful only the decision to hold the latter two events, not the first one, which preceded the advice. But Rodriguez was surcharged for all three. Second, the evidence shows that Kagan’s advice on this issue was entirely equivocal, and not the firm warning the district court implied it had been.
 
 See
 
 71 B.R. at 423 (“The hotel’s comptroller advised him of the loss and that no further dinner boxing should be held.”). For instance, a contemporaneous Kagan memorandum regarding the losses from the first event set forth this tepid conclusion:
 

 The present loss is obviously unacceptable on a continuing basis. A small loss of say one or two thousand may be acceptable, considering possible Casino business and public relations value. This
 
 *952
 
 was a first attempt, without too much advertising. If there is a good market for this type of show a second bout should be expected to draw at least 500 paying customers.
 
 [25]
 
 Even an uptrend like that may not be significant as there may be a one time “curiosity” market, which will soon dry up. Therefore, a second bout may be throwing good money after bad. If a second bout is held, the results should be carefully reviewed before any automatic continuation.
 

 The memo also noted that hotel revenues from dinner boxing might be improved by permitting television broadcasting of the events. Kagan’s trial testimony was no more firm regarding advice against future shows. He stated only that “I believe that it [was] suggested that another one not be held.” We do not think it proper to infer from this uncertain evaluation that a decision to hold additional events was necessarily unreasonable, let alone intentionally harmful.
 

 Third, with respect to complimentary tickets, the evidence also does not support the court’s finding. Although the court found that Rodriguez himself “issued complimentary tickets in great numbers to his friends and acquaintances for all these events,” 71 B.R. at 423, Kagan’s memo states that the eighty-two complimentary tickets for the first event “apparently were controlled by different people.”
 
 [26]
 
 There was absolutely no evidence regarding complimentary tickets for the last two events. Finally, even if it had been shown that Rodriguez himself had controlled the complimentary tickets for the first event, Ka-gan’s calculations show that the tickets cost the hotel only $1,920; they do not account for the full $10,987 loss for which Rodriguez was surcharged.
 

 Entertaining all reasonable inferences favorable to the district court’s conclusion, we think that the evidence will not support the finding that Rodriguez’s intentionally harmful acts caused a $30,987 loss to the estate. The surcharge is reversed.
 

 I.
 
 Write-Off of Joaquin Soler’s Casino Gambling Debt
 

 As we noted above, the district court used the term “write-off” somewhat loosely in describing Rodriguez’s collection of debt-collateral belonging to Banco Popular. With respect to the gambling debt of Joaquin Soler, however, the court did receive evidence that Rodriguez actually “wrote off” part of a debt, accepting $25,000 in cash and property in complete satisfaction of a $33,500 obligation. Finding that Rodriguez acted intentionally in disregard of the estate’s interest by doing so, the court surcharged him for the resultant loss to the estate of $8,500. 71 B.R. at 423.
 

 Rodriguez’s alleged impropriety here lay primarily in the fact that he accepted in settlement of the debt not just cash, but $5,000 in cash plus four automobiles worth $5,000 each. As the court noted, evidence showed that each of the cars had been registered temporarily in the name of a hotel employee designated by Rodriguez before they were sold. From this, the court seems to have inferred that Rodriguez wrongfully permitted those employees to benefit personally from property belonging to the hotel. We acknowledge that Rodriguez’s registering of the cars in employees’ names is a questionable practice at best. But, Alba Casanas, the only employee who testified regarding the use of her name for a car registration, said that she never even saw the car, let alone used it. Moreover, Lopez himself testified that all four cars were sold and the proceeds of $20,000 deposited into the hotel’s account. Thus, even assuming that the car transaction was wholly inappropriate, the evidence shows that the estate lost no money
 
 *953
 
 through this transaction because the full $20,000 value of the cars was obtained.
 
 [27]
 
 There is also no evidence that Rodriguez or any hotel employee personally profited through this deal.
 

 To be sure, the hotel did lose its claim to an additional $8,500 from Soler as a result of Rodriguez’s collection and write-off. But we have found no evidence supporting the inference that Rodriguez’s decision to accept seventy-five cents on the dollar ($25,000/$33,500) for a gambling debt was at all unusual, let alone improper. Indeed, Rafael Ruiz Diaz (Ruiz), a former casino manager at the hotel, testified that writing off part of casino debts was a “regular practice in the industry.” Ruiz stated that a write-off of up to thirty percent was generally considered acceptable because it would cost that much to pursue the debt through legal channels and, after doing so, the client would be permanently lost. This general practice of partially writing off debts was confirmed by Casa-nas, the former casino comptroller, who also noted that Soler was a regular patron of the hotel who “owe[d] a lot of money [and] paid a lot of money” and so the hotel “gave him a discount.”
 

 Given this testimony and the lack of any contrary indications in the evidence, we think it was clear error for the district court to conclude either that writing off part of Soler’s debt was improper or that $8,500 represents a “loss” to the hotel caused by Rodriguez. The surcharge must, therefore, be reversed.
 

 J.
 
 Improper Payments to Miguel de Angel
 

 The district court found that Rodriguez hired Miguel de Angel as a financial/accounting consultant at the hotel in spite of the fact that Rodriguez knew de Angel “could not qualify for appointment by the bankruptcy court.” 71 B.R. at 424. Describing de Angel as Rodriguez’s “right hand in devising means to cover up the hotel’s precarious economical position,” the court also found that de Angel charged excessive rates for his services and that he took expense allowances without accounting for them.
 
 Id.
 
 Some of the charges for de Angel’s services were approved by the bankruptcy court, but the district court did surcharge Rodriguez for $6,500 paid by the estate to de Angel without bankruptcy court authorization. Rodriguez makes no specific arguments challenging this surcharge, which we let stand.
 

 K.
 
 Unaccounted For Expense Allowances
 

 The district court’s final surcharge was $37,350 representing expense allowances drawn by Rodriguez from a New York bank account maintained by the hotel. No documentation regarding the purpose of these expense allowance draws was produced at trial. The court thus concluded that they “were not for expenses” and that they “amounted to additional compensation for the trustee.” 71 B.R. at 425.
 

 Rodriguez does not contest that he indeed drew $37,350 out of the New York account, but he does raise several defenses. First, he points out that in July of 1980, the bankruptcy court explicitly authorized him to draw $750 per week in compensation plus “expenses incurred in the performance of his duties.”
 
 See In re San Juan Hotel Corp.,
 
 No. B-80-00259 (Bankr.D.P.R. July 24, 1980). Second, he argues that he has, at least in some respects, “accounted” for the expense draws by submitting memoran-da regarding expenses to Kagan, and by deducting $42,600 in expense advances from his request for compensation. We think that Rodriguez’s arguments have some merit, at least insofar as the bankruptcy court authorization rebuts the implication that drawing an expense allowance was itself impermissible.
 

 
 *954
 
 There is, however, a more fundamental reason why this surcharge cannot stand. During Lopez’s testimony, while he was under direct examination by counsel for the United States, the following was revealed about the $37,350 in questionable expense checks:
 

 Q: Mr. Lopez, take a look back here. Do the back of the checks appear in this exhibit?
 

 A: Yes.
 

 Q: And is there a notation on there showing where the checks were cashed or deposited?
 

 A: San Juan Hotel Corporation. It looks like the stamp of the San Juan Hotel here. They were cashed at the hotel.
 

 Q: But they were drawn on a New York bank?
 

 A: They were drawn on the Sterling Bank of New York.
 

 THE COURT: Mr. Lopez, would you please examine the reverse side of the checks. You say they were cashed in the hotel. According to this one that I have here, they seem to have been deposited.
 

 THE WITNESS: For deposit only. And it says San Juan Hotel Corporation. So they must have been cashed at the hotel. They were cashed and then deposited back into the hotel’s account.
 

 We think it goes without saying that if the $37,350 drawn on the New York account of the hotel was simply deposited back into a Puerto Rico account of the hotel, then it represents neither a loss to the estate nor a gain by Rodriguez. And the above-quoted testimony establishes that only a transfer occurred. It is possible, of course, that once the money was placed into the Puerto Rico account, it was then incrementally withdrawn by Rodriguez for his own benefit. But we find no evidence in the record to that effect and we do not think it proper to infer from the fact that Rodriguez moved money between accounts that such was the case.
 

 Aside from copies of the checks themselves, the only evidence relied upon by the district court to support this surcharge was Lopez’s testimony that Rodriguez drew expense money out of the New York account but never accounted for it. As set out above, Lopez’s testimony also establishes that even if Rodriguez acted improperly by withdrawing money without filing an accounting of it, there has been no harm to the estate because the same money was redeposited in another hotel account. The surcharge of $37,350 is, therefore, reversed.
 

 IV. DISCHARGEABILITY OF RODRIGUEZ’S LIABILITY
 

 The last issue to be addressed is one raised by the following passage, which appears at the end of the district court’s opinion and order in this case.
 

 Finally, we have examined, but do not pass upon, defendant’s pending application for final compensation before the bankruptcy court in the total amount of $462,985, Addendum B to this opinion and findings. However, leaving dollars and cents aside, an examination of the allegations there contained, in light of the evidence received here, further convinces us that defendant’s liability is of such magnitude that he would not be entitled to a discharge under the equitable principles supporting bankruptcy. 11 U.S.C. sec. 523(a)(4). The evidence received here is incompatible with the claims made there.
 

 To this paragraph was appended the following footnote:
 

 Under the former Bankruptcy Code of 1898, this exception to discharge was enacted at sec. 35(a)(4). It was adopted in the Bankruptcy Act of 1978, and followed into existence in the Bankruptcy Amendments and Federal Judgeship Act of July 10, 1984. This section does not apply automatically. It applies only when the bankrupt seeking discharge was acting as a trustee before the debt accrued; in other words, the fiduciary relationship had to exist prior to the accrual of the debt in controversy. Fraud or defalcation are grounds to deny discharge of a debt only when the debtor seeking discharge was the fiduciary of the creditor. Fraud justifying denial of discharge consists of deceit, bad faith or
 
 *955
 
 immorality. The required elements are clearly here.
 

 71 B.R. at 428 & n. 12 (case citations omitted). Before addressing the parties’ arguments regarding this passage, it should be noted that the issue of dischargeability discussed by the court was never raised by any of the parties. It was raised by the court
 
 sua sponte.
 

 Rodriguez interprets the court’s above-quoted statement to mean that, should Rodriguez decide personally to file for bankruptcy, his
 
 Mosser
 
 liability from this case would not be a dischargeable debt. Rodriguez maintains that the court erred by deciding this question, which was not before it. Lopez responds by arguing that the court did not actually decide the dis-chargeability issue, but merely made a pertinent observation: that the harm Rodriguez “caused is not of the type that can be discharged in bankruptcy.” Brief for Ap-pellee at 49 n. 35. We are not sure that either of these interpretations is entirely correct and, indeed, it appears that the court actually may have confused two different concepts of discharge in the disputed paragraph. By referring to Rodriguez’s outstanding application for compensation, the paragraph seems at first to refer to a trustee’s formal discharge from liability, a concept we have discussed
 
 supra
 
 at 939-940. Then, switching gears and citing to section 523(a)(4),
 
 [28]
 
 the passage clearly seems to anticipate the possibility that Rodriguez may file for individual bankruptcy and seek to have all his outstanding debts discharged.
 

 Importantly, however, neither of these issues was before the district court and thus nothing in the district court’s opinion can or should be treated as deciding them. With respect to Rodriguez’s discharge from liability as a trustee, we interpret the court’s statement that it was not passing upon the application for compensation as itself establishing that no decision was made. With respect to Rodriguez’s ability to seek an individual discharge, we note that this issue has already been decided in our
 
 Connecticut General
 
 decision. As in this case, the district court in
 
 Connecticut General
 
 declared that the
 
 Mosser
 
 liability it imposed on Rodriguez was “not dischargeable in bankruptcy.” 838 F.2d at 623. As we wrote then and as is equally true here:
 

 The Rules of Bankruptcy Procedure provide that dischargeability is a question to be raised before a bankruptcy court only after bankruptcy proceedings have been initiated. Bankr.Rules 4004-08. At that time, a discharge “shall” be granted to individual debtors
 
 unless
 
 an objection is filed or the debtor waives the discharge. Bankr.Rule 4004(c). And the objector carries the burden of proof. Bankr.Rule 4005. Because Rodriguez has not filed for bankruptcy, the district court’s decision regarding discharge is premature and must be vacated.
 

 Id.
 
 at 623 (emphasis in original).
 

 V. SUMMARY
 

 The surcharge of $1,260,000 for the hotel workers’ pay raise and the finding that Rodriguez is liable for up to $1,000,000 for the casino workers’ back pay award are affirmed. The $94,094 surcharge for unpaid union dues is reversed. The surcharge for Commonwealth tax penalties and interest in the amount of $461,353.66 is affirmed. The imposition of $1,240,832.94 in federal tax liability is reversed; Rodriguez is surcharged for $388,785.94 representing penalties and interest only. The surcharge for $273,832.94 relating to casino accounts receivable belonging to Banco Popular is reversed. The personal use surcharges of $15,000 and $6,000, as well as the $6,500 surcharge for unauthorized payments to de Angel, are affirmed. The remaining surcharges — $30,987 for dinner boxing show losses, $8,500 for writing off a casino debt and $37,350 for expense allowance draws — are reversed.
 

 Judgment should thus be entered against Rodriguez in the amount of $2,137,639.60,
 
 *956
 
 along with additional potential liability up to $1,000,000 for the casino workers’ back pay award.
 

 Remanded for entry of amended judgment in accordance herewith.
 

 Costs on this appeal awarded to appellee.
 

 [1]
 

 . Rodriguez’s tenure as trustee eventually stretched on for over three years and no bond was ever posted.
 

 [2]
 

 . Lopez opposed an action riled by Kagan, the former comptroller of the hotel, against Rodriguez on behalf of the estate. Lopez maintained that the claims in that suit were unsubstantiated and duplicative of the allegations in the United States’ case.
 
 San Juan Hotel II,
 
 841 F.2d at 8.
 

 [3]
 

 .
 
 See
 
 71 B.R. at 421 n. 6. Under the terms of a stipulation, the hotel's mortgagee was entitled to an immediate judgment of execution if the hotel closed even temporarily.
 
 Id.
 

 [4]
 

 . In describing the lawsuit underlying this appeal, we use Lopez’s name to describe actions and positions taken by the United States on his behalf.
 

 [5]
 

 . "Some courts have even held that personal liability can be imposed for negligent acts, at least where discretionary judgments are not involved."
 
 Connecticut General,
 
 838 F.2d at 621 (citing
 
 Gorski,
 
 766 F.2d at 727;
 
 Cochise College Park,
 
 703 F.2d at 1357 & n. 26). As in
 
 Connecticut General,
 
 the district court in this case found that Rodriguez acted intentionally. Hence we need not reach the issue of whether negligent acts also give rise to personal liability.
 

 [6]
 

 . In support of his attack on Lopez’s standing, Rodriguez cites
 
 Caplin v. Marine Midland Grace Trust Co.,
 
 406 U.S. 416, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972), and
 
 In re Ozark Restaurant Equipment Co.,
 
 816 F.2d 1222 (8th Cir.),
 
 cert. denied,
 
 — U.S. -, 108 S.Ct. 147, 98 L.Ed.2d 102 (1987), but those cases are not on point. Both involve claims by trustees on behalf of creditors against third parties; neither involves nor purports to apply to the imposition of
 
 Mosser
 
 liability
 
 against
 
 bankruptcy trustees. .
 

 [7]
 

 . Lopez also argues that Rodriguez’s standing argument is untimely and should not be considered because in the district court Rodriguez’s claim was that the United States was not the proper party to sue on behalf of the estate. The issue of the United States’ role is, however, an altogether separate one, and the fact that Rodriguez challenged this action on that ground does not mean that he waived other standing defenses. In essence, Rodriguez’s "standing" argument on appeal is simply that Lopez has failed to show that the estate was harmed with respect to some of the surcharged items. The extent of harm has been a disputed issue throughout this litigation, Rodriguez’s position being that he caused no harm whatsoever.
 

 [8]
 

 .
 
 See Connecticut General,
 
 838 F.2d at 621-23 (creditor has cause of action against trustee personally for harms caused to creditor by trustee’s intentional violation of fiduciary duty).
 

 [9]
 

 . Rodriguez has suggested that the statute began to run sooner because, he maintains, creditors should have been aware of his alleged wrongdoing at the time it occurred. But this argument is patently meritless. Before September of 1983, the only person authorized to sue Rodriguez on behalf of the estate was Rodriguez himself, as trustee.
 

 [10]
 

 . In its opinion, the district court erroneously stated that the collective bargaining agreement had been “rejected” before Rodriguez became trustee, 71 B.R. at 420, but such rejection actually had only been requested at that time.
 

 [11]
 

 . In the appendices submitted to this court on appeal, Rodriguez has included the application to reject the agreement with Local 610 and the union’s reply, both of which were filed with the bankruptcy court. Lopez argues that these documents constitute an improper supplement to the record on appeal since they were not admitted as exhibits in the district court. Rodriguez counters that they were properly included because the district court announced that it was taking judicial notice of the entire bankruptcy file. We think that the documents are not helpful to Rodriguez’s appellate arguments in any event, and thus in the interest of simplicity we have assumed without deciding that they are properly before us.
 

 [12]
 

 . The district court described the raises as seven and one-half percent pay raises, but, because Kagan’s calculations were obviously based on seven percent, we use that figure.
 

 [13]
 

 . It is clear from Kagan's testimony that both figures were actually estimates, the pay raises in fact having been calculated at a particular number of cents per hour. Because neither party challenges these estimates, we accept them, although we note that it is much better practice to use exact figures in calculating a
 
 Mosser
 
 surcharge when, as here, they are available.
 

 [14]
 

 . Rodriguez also mounts an oblique attack on Kagan’s testimony about the firing incident, claiming that Kagan's reference to the advice of Rodriguez’s lawyers is "generalized and conclu-sionaiy and hearsay (and possibly protected by the attorney and client privilege)." Brief of Defendant-Appellant at 30 n. 39. But, as Rodriguez admits, there was no objection to this testimony in the district court on any of these grounds. Moreover, Rodriguez has not even argued to this court that the evidence was actually inadmissible, but only that "it would be a miscarriage of justice to impose millionaire liability on the trustee on the basis of those generalized and conclusionary statements.”
 
 Id.
 
 We think this half-hearted and
 
 post hoc
 
 objection is so clearly without merit that it warrants no further discussion.
 
 See
 
 Fed.R.Evid. 103.
 

 In a related matter, we note that through post-trial motions, Rodriguez attacked from another front the district court’s reliance on this same Kagan testimony. According to Rodriguez’s motion, Kagan testified that Rodriguez’s lawyers told him firing would be "legal,” not "illegal." But as the district court pointed out in denying the motion, this misapprehension was due to an error in transcription which was corrected by motion of the court reporter. Kagan’s intention to use the word "illegal” was in any event obvious from the surrounding statements.
 

 [15]
 

 . Rodriguez makes the additional argument that he did not in fact intend to "fire" the casino workers, but only, in the words of his letter of June 20, 1982, to "replace [them] permanently." Like the district court and the ALJ, we have trouble perceiving the distinction between firing and permanent replacement. Moreover, in light of the fact that Rodriguez chose to act contrary to the legal advice he was given, we are not inclined to give him the benefit of the doubt for having chosen words whose legal effect he did not intend. The finding that he intended to fire the workers was certainly not clear error.
 

 [16]
 

 . Lopez’s only argument on this point is this conclusory assertion: "Rodriguez's contention that he cannot be surcharged for this (or any other amount) because the estate was not harmed is meritless." Brief for the Appellee at 34 n. 24.
 

 [17]
 

 . The district court's opinion does not accurately reflect all of the pertinent figures. For instance, although Fonseca testified that the figure she presented did not include real property tax, the district court’s opinion set out the estate's supposed property tax liability. The figures used for that category of tax are a strange amalgam of the figures we have listed above, with the principal of the supposed property tax —$1,744,290.66—actually being the total of principal, interest and penalties for the other three categories. The $461,353.66 the district court said was interest and penalties for property tax is actually, as indicated, the combined interest and penalties for the three taxes testified to by Fonseca. Because the district court surcharged Rodriguez only for the correct penalty and interest figure of $461,353.66 and not for any nonexistent property tax penalties, these errors
 
 *947
 
 in the text of the opinion do not undermine the court's finding on this surcharge.
 

 [18]
 

 . Section 6672 provides in pertinent part:
 

 Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat such tax or the payment thereof, shall, in addition to the other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over.
 

 [19]
 

 . The court did not explicitly state that it was relying on the IRS tax schedules, but the figures it used are indisputably taken from those schedules. Further, the IRS schedules are the only evidence in the record which comprehensively analyzes the estate’s federal tax liability.
 

 [20]
 

 . To omit the amounts from pre-Rodriguez periods, the court simply deducted the first line on each schedule which pertained to the third quarter of 1980. Rodriguez became trustee on July 10, 1980, ten days into that third quarter. Both schedules extend only through March 31, 1983 appnnumateiy the time the hotel closed and liquidation proceedings were initiated.
 

 [21]
 

 . This calculation breaks down as follows:
 

 Exhibit 258
 

 Delinquency Penalty: $ 69,219.34
 

 Failure to Deposit Penalty: 62,549.88
 

 Failure to Pay Penalty: 40,498.11
 

 Original Interest Assessed: 144,258.91
 

 Additional Penalty as of 3/31/83: 5,123.49
 

 Merest as of 3/31/83: 18,204.60
 

 Exhibit 259
 

 Delinquency Penalty: 19,081.21
 

 Interest as of 3/31/83: 29,850.40
 

 Total Penalties and Interest: $388,785.94
 

 [22]
 

 . The documentation submitted by Banco Popular does contain some handwritten notations indicating that $11,824 of the $273,832.94 is attributable to write-offs. However, even if we assume that this figure is accurate, we have no evidence that those write-offs were
 
 improper
 
 in the sense that the debts actually could have been collected. Rather, the only harm identified by the district court was harm to creditors who did not receive notice of and credit for Rodriguez’s collections.
 

 [23]
 

 . In addition to these two items, the district court's opinion also identifies evidence that Rodriguez had free meals and liquor at the hotel and that he extended such privileges to certain of his associates. He was not surcharged for these costs, nor was he surcharged for the nightly cost of the Presidential Suite, but only for the cost of its remodeling.
 

 [24]
 

 . Although the court did not explicitly state the basis for the $30,987 figure, its analysis appears to have been this. A contemporaneous Kagan memo calculated the loss for the first boxing show at $10,987, and this figure was confirmed in Kagan’s testimony. Kagan also testified that two more such shows were held, each resulting in a loss, though Kagan did not specify the amount of loss for either. From this, the district court estimated that the losses for the second and third shows were $10,000 each, approximately the same as the loss for the first.
 
 See
 
 71 B.R. at 423 ("two additional dinner boxing shows ... generated losses of some $10,000 each”). The $30,987 figure is the sum of the first $10,987 loss and the two estimated $10,000 losses.
 

 [25]
 

 . The first event had only 280 paying customers. If 500 paying customers had attended it, the hotel would have had an additional $9,000 to $11,000 (220 tickets x $40-$50/ticket) in revenues, enough approximately to break even.
 

 [26]
 

 . At trial, Kagan contradicted this memo, stating that "all [the complimentary tickets] were given out by Mr. Rodriguez." But we can not reasonably credit this offhand assertion over a contemporaneous written account. It was made years after the events in question and after Kagan developed at least potential bias against Rodriguez.
 

 [27]
 

 . The district court also concluded that the sale of the cars was not "in the ordinary course of business," as that phrase is used in section 363(b) of the Bankruptcy Code, and thus that notice to creditors and a hearing were required before Rodriguez could sell the cars. Because there was no notice and hearing, the court termed this another violation of Rodriguez's fiduciary duties. In light of the fact that we have found no harm to the estate, such a potential breach of duty is irrelevant to our analysis and will not be addressed.
 

 [28]
 

 . Section 523(a)(4) provides that a bankruptcy court discharge "does not discharge an individual from any debt ... for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."