**In the matter of Stephen Randel BLUM and Edith Blum, and Blum Chevrolet, Inc., Debtors.**

**Stephen Randel BLUM and Edith Blum and Blum Chevrolet, Inc., Petitioners,**

v.

**Thomas L. WILLIAMS, trustee in bankruptcy, General Motors Corporation, General Motors Acceptance Corporation, and United Missouri Bank of Carthage, Respondents.**

**Bankruptcy Nos. 81–02163–SW, 81–02408–SW.**

United States Bankruptcy Court, W.D. Missouri, Southwestern Division.

· April 19, 1985.

James F. DeNeen, Joplin, Mo., for petitioners.

Thomas L. Williams, Roberts, Fleischaker & Scott, Joplin, Mo., for respondents.

John S. Pratt, Pratt & Fossard, Springfield, Mo., for GMC & GMAC.

Albert D. Johnston, Johnston & Carlton, Carthage, Mo., for UMB of Carthage.

## ORDER DENYING THE OBJECTION OF STEPHEN RANDEL BLUM TO THE SETTLEMENT PREVIOUSLY EFFECTED BETWEEN THE TRUSTEE IN BANKRUPTCY AND THE OTHER RESPONDENTS

DENNIS J. STEWART, Bankruptcy Judge.

In the hearing conducted by the court on November 9, 1984, in Joplin, Missouri, it was ascertained that the petitioners no longer had any objection respecting the amounts which had been paid by the former trustee and the current trustee to the United Missouri Bank of Carthage, but rather that the debtor's entire objection was now addressed to the reasonableness of the settlement with the General Motors Acceptance Corporation. In support of this objection, the debtors assert that they did not receive timely notice of the proposed settlement which was ultimately approved by the court. They further state that the settlement which was approved by the court was to the effect that the trustee should accept the sum of $7,000 from General Motors Acceptance Corporation in full settlement of any claim based on the dealer reserve account held by the latter; that, as of the date of bankruptcy, the monies in that dealer reserve account were in excess of $20,000; and that, under the following contractual provisions, the trustee in bankruptcy, as the successor in interest of Blum Chevrolet, Inc., was entitled to receive that amount as of the date of bankruptcy:

"In the case of contracts supported by the dealer's guaranty, whether unconditional or governed by the foregoing provisions for division of responsibility, GMAC, in purchasing such contracts at the rate of discount established by it with the dealer, retains out of the proceeds an amount equal to a designated percentage of the itemized unpaid balance-amount financed in the contract. GMAC credits to the dealer's account all amounts so retained, subject to GMAC's right to hold such credits as security for payment, and at its own election to apply same at any time in satisfaction of any obligation of the dealer to GMAC, whether or not such obligation results from the dealer's guaranty.

"GMAC periodically pays to the dealer the amount, if any by which the aggregate of credits held by GMAC at the time of such periodic payments exceeds a designated percentage of the aggregate amount of the unpaid balances under contracts purchased up to that time from the dealer and then outstanding. However, in the event that GMAC deems the dealer substantially to have discontinued submitting retail contracts to it for purchase, whether by virtue of liquidation of the dealer's business or for any other reason, GMAC reserves the right to discontinue payment of any such excess of credits and to continue to retain such credits up to an amount which in GMAC's estimation is sufficient for the foregoing mentioned security purpose. As liquidation of the dealer's obligation progresses, any sums in excess of that considered as sufficient by GMAC will be paid periodically to the dealer."

See "The GMAC Wholesale Plan," p. 16, as incorporated into the "GMAC Retail Plan" contract with Schumacher & Blum Chevrolet, Inc., signed September 29, 1980. It is to be noted that, under the explicit terms of the governing contract, GMAC had the right to estimate, in its sole discretion, the amount which was to be retained as security for possible future defaults by customers. Further, even after liquidation of ,a business, GMAC had the right to retain all amounts considered necessary by it, in its sole discretion, "as sufficient." This contract, according to its precise wording, confers no right of payment to any certain or calculable sum upon the debtor corporation, nor upon its successor trustee in bankruptcy. This is an important facet of the review of the former settlement, for the courts have generally held that it is the terms of the contract which control the matter and that, if they do not grant the debtor any right of payment *as of the date of bankruptcy,* then none of the funds in the dealer reserve account become part of the bankruptcy estate. Thus, in the case of *Matter of American Motor Home Rentals,* 10 B.R. 53, 54, 55 (Bkrtcy.W.D.Mo. 1981), when the contract expressly provided that credits "in excess of $4,000 of the then aggregate total payments of all contracts purchases" were payable to the debtor as that excess might arise, the excess was payable to the debtor's trustee in bankruptcy as of the date of bankruptcy.[1] But, in a later case, in which the contract did not grant any *right* to payment, the district court has held that the dealer reserve account is not payable in any part to the debtor or his successor in interest, the trustee in bankruptcy, as of the date of bankruptcy.[2] It is at least doubtful, as

**1.** In that case, the court held that all over $4,000 in the dealer reserve account should be paid to the trustee. It read "in excess of $4,000 of the aggregate total of payments of all contracts purchased" to mean payments which had actually been made into the dealer reserve account. In view of the fact that the contractual provision might have been ambiguous in this respect, the court's construing it against the non-drafting party followed a standard and recognized canon of construction. And there was no ambiguity in the contractual provision of the right of the

debtor—and his trustee—to payment of some magnitude of excess in the dealer reserve account.

**2.** See *In re Amco Products,* 50 B.R. 723 (W.D.Mo.1983), in which, in the absence of a clear contractual *right* to payment, it was held that "the only property or interest available to either a judicial lien creditor or the bankrupt is that potential interest in the account set out in the dealer agreement, i.e., the right to any funds

noted above, that the above quoted contract grants the debtor any *right* of recovery of excess amounts as of the date of bankruptcy; rather, it appears to leave payment within the *discretion* of GMAC. If so, according to the district court's holding, the trustee could have recovered nothing from the GMAC on account of any excess in the dealer reserve account.

■ And certainly, the trustee was entitled to take the potential for non-recovery manifestly offered by this decisional law into account in making his compromise and settlement. Further, since the date of the hearing of November 9, 1984, this court has again reviewed the court file in *Daniels, trustee, v. General Motors Acceptance Corporation,* Adversary Action No. 83–0192–SW (Bkrtcy.W.D.Mo. July 28, 1983). It shows that the defendant General Motors Acceptance Corporation in that case had seized upon this point of law to assert that "the total amount of ... customer prepayments, repossessions and losses cannot be determined until all said customer contracts assigned to GMAC by Debtor have been liquidated which, according to the expiration date of existing customer accounts will be November 1985." See "Amended Answer and Affirmative Defenses of Defendant, General Motors Acceptance Corporation (GMAC), filed May 23, 1983, in Adversary Action No. 83–0192–SW. Under such circumstances, if proven, when the right to payment could only accrue after the date of bankruptcy, the district court opinion would preclude any finding that the monies in the dealer reserve account in any part belonged to the estate in bankruptcy. Discovery conducted by the trustee in connection with that adversary action further demonstrated that, as of April 29, 1983, there was some $15,704.21 in the dealer reserve account. The debtor Stephen Randel Blum, in the course of the hearings which have been conducted

by this court, has complained that much more was in the dealer reserve account as of the date of bankruptcy. In this regard, his contentions seem to be buttressed by the complaint filed in Adversary Action No. 83–0192–SW by the trustee in bankruptcy, in which he requested turnover of the sum of $27,000 from the dealer reserve account. But it is not the great magnitude of monies which may be in the account as of the date of bankruptcy which is determinative of the matter. In the case upon which the district court opinion is predicated, *In re Amco Products, Inc.,* Civil Action No. 82–0227–CV–W–3 (W.D.Mo. July 25, 1983), there was some $32,162.52 in the account as of the date of bankruptcy. But, "(u)nder the dealer agreement between Bank and Amco, Amco had no right to withdraw at will. The contract specifically stated that the bank *may* release portions from the account but did not require such release until all contracts and obligations of Amco were liquidated even after termination of the agreement." (Emphasis in original.) Accordingly, the district court concluded that "the bankruptcy court's finding that the trustee was entitled to the full $32,162.52 in the account at the time of the filing of the bankruptcy petition was based on an erroneous view of the law." And, in this case, even at the conclusion of the entire process of liquidation of the dealer's account, there was no clear contract right to payment, but rather only a stated intention by GMAC to pay over any amounts over those "considered as sufficient by GMAC." In view of this potential that a court might hold that none of the amounts might be payable to the trustee and in view of the facts that the reserve account had diminished some $12,000 during the pendency of the chapter 7 case and that it would be over two years before the excess could finally be determined, it seems in retrospect that the trustee was well warranted in accepting a sum in settlement of

remaining after all contracts are liquidated. The trustee is entitled only to this *potential* interest ..." (Emphasis added.) Further, according to the principles which are set out below in the text of this memorandum, that interest, existing as of the date of bankruptcy, can

only be estimated. And, in this action, in estimating the amount which might be left at a later time, the trustee obviated the risk that there might, because of contingencies later developing, be nothing left in the dealer reserve account.

less than half the current outstanding amount. A two-year pendency of the litigation might well have totally consumed those sums in attorney's fees, even as the risk daily increased that there might be no funds left in the account as of the date of final liquidation. According to the statements made by a representative of GMAC in the course of the last hearing of this matter, the sums currently in the account were in close approximation to the sum for which the trustee settled. So, even accepting the figures which have been supplied by the debtors, it appears, without more, that the settlement made by the former trustee in this regard was not without the pale of reason in view of the potential customer defaults in the future and the additional doubt over whether the contract would permit any recovery at all by the trustee. If the matter had been left to decision by the court, this rule of reasonableness in estimating the excess is virtually all that could have been employed.

It seems to be the current contention of the debtor Stephen Randel Blum that this court should now proceed to undertake a precise accounting as to how much may be left in the dealer reserve account when all of the purchased retail contracts have been paid. But that is necessarily uncertain until they have all been paid. For it is the unexpected default or other unexpected event for which the dealer reserve account is to serve as security. Given all the facts which have been presented to the court, it cannot be said in retrospect that the trustee's compromise and settlement was not fair, just, and reasonable. Accordingly,

this court, on the merits of the matter, elects to deny the motion of Stephen Randel Blum to set aside the formerly approved settlement.

### Loss of Jurisdiction

This court recognizes that determination of the motion now before the court has been considerably delayed. Counsel for the debtor has written at least one letter to this court urging a greater degree of celerity than that with which the court has been able to treat this case. But the matter which has given the court considerable pause is that this court, because of judicial decisions which have intervened since the date of the last hearing in this action, has now lost jurisdiction of it. The last hearing was conducted by the court in Joplin, Missouri, on November 9, 1984. Some two weeks later, three federal district court decisions confirmed the powers of bankruptcy judges to exercise the jurisdiction defined in the Bankruptcy Amendments and Federal Judgeship Act of 1984.[2a] This meant that the bankruptcy court could no longer exercise the broader range of jurisdiction which it had exercised at the time this adversary action was instituted.[3] This court could formerly continue to exercise such jurisdiction as holdover judges exercising the jurisdiction which had attached at the commencement of the action, so long as the bankruptcy judges' right and duty to exercise the jurisdiction defined in the Bankruptcy Amendments and Federal Judgeship Act of 1984 was under challenge.[4] Once, however, that challenge has

---

**2a.** "Very recently ..., three district courts have held the current tenure of the bankruptcy judges to be lawful and constitutional. See, e.g., *In re Wasatch Factoring, Inc.*, 12 B.C.D. A1 (D.Utah Nov. 29, 1984); *In re Benny*, 44 B.R. 581, 12 B.C.D. 495 (N.D.Cal.1984); and *In re Tom Carter Enterprises, Inc.*, 44 B.R. 605, 12 B.C.D. 536 (C.D.Cal.1984). It has not yet been reported whether appeals have been taken from those orders and judgments, but it appears that this court may now, with some minimal assurance, at least, of its own power to enter these judgments, proceed with them." *Matter of Newcomb*, Adversary Actions Nos. 82–1817–SW, 82–1938–SW, and 82–2004–SW (Bkrtcy.W.D.Mo. Jan 4, 1985).

**3.** The subject adversary action was instituted on February 10, 1983. At that time, the bankruptcy court still had the power to exercise consent jurisdiction. See, e.g., *Matter of Brown*, 26 B.R. 119, 121 (Bkrtcy.W.D.Mo.1983).

**4.** While the status of the bankruptcy judges under the new Act was being contested, the former jurisdiction could be exercised by those judges acting as holdover judges under the prior tenure statute, exercising the previously-existing forms of jurisdiction. See, e.g., *Matter of Monson*, 46 B.R. 3, 8, n. 8 (Bkrtcy.W.D.Mo.1984).

been resolved by a federal court, that jurisdiction, which purports to apply to all cases which were pending or filed after June 28, 1984, must be applied to the exclusion of the formerly-existing jurisdiction.[5]

This action, therefore, which is a suit on a contract, is without the compass of bankruptcy court jurisdiction. *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). At the time this action was initially commenced, it was possible for this court to exercise consent jurisdiction over actions which might otherwise have been without its subject matter jurisdiction.[6] But that is no longer possible under the Bankruptcy Amendments and Federal Judgeship Act of 1984.[7] Accordingly, this court, at this time, can only conclude that it has lost jurisdiction.

■ It is recognized that, ordinarily, a motion for relief from judgment takes for its jurisdictional basis the jurisdiction which was in effect at the time the case

was commenced.[8] But, again, that rule applies only in the absence of a statute which expressly restricts such jurisdiction in the meantime. And, in this case, the Bankruptcy Amendments and Federal Judgeship Act of 1984, as applicable, contains such a statute.[9] Accordingly, even if there were some defect in the court's former final judgment in this action, the court has lost jurisdiction to correct it. Nor can it be said that the district court has such power.[10]

### Lack of standing of the individual debtor to challenge former judgment

■ Further, it appears that, under the case decisions which bind the action of this court, the individual debtor lacks standing to complain of the judgment which involves the distribution of assets in a related corporate bankruptcy case, which, nevertheless, has not been consolidated "substantively" with his individual case.[11]

---

5. See section 115(a) of P.L. 98–353, providing that the new jurisdiction shall apply to, *inter alia,* "cases under title 11 of the United States Code, and proceedings arising under title 11 of the United States Code or arising in or related to cases under title 11 of the United States Code, that are pending immediately before (the date of enactment of this Act)." As to the question of the legality of the tenure of bankruptcy judges, the Director of the Administrative Office of the United States Courts clearly stated in his letter of July 11, 1984, in his letter to the chairman of the Senate Committee on the Judiciary that "(o)nly a court decision can finally resolve whether section 121 (the new tenure statute) is or is not constitutional."

6. See note 3, *supra.*

7. See section 157(b)(3), Title 28, United States Code: "The bankruptcy judge shall determine, on the *judge's own motion* or on timely motion of a party, whether a proceeding is a core proceeding under this subsection or is a proceeding that is otherwise related to a case under title 11." (Emphasis added.)

8. "It is a fundamental principle of federal procedure that the existence of jurisdiction is determined as of the filing of the complaint ... If jurisdiction exists at the outset of a suit, subsequent events will not divest the court of jurisdiction.... These principles are controlling in this case. It is clear that a Rule 60(b) motion is considered ancillary to or a continuation of the

original suit; the motion thus requires no independent jurisdictional ground ... If the district court had jurisdiction when the original suit was filed, it has jurisdiction to entertain a Rule 60(b) motion. This jurisdiction is not divested by subsequent events." *Smith v. Widman Trucking & Excavating,* 627 F.2d 792, 799 (7th Cir.1980). But a well-settled proviso to this rule is that "(a) court that has jurisdiction of a case may lose it by a statute subsequently abolishing the jurisdiction of the court in a case of the kind involved where the statute expressly provides, or is construed to the effect, that it is intended to operate *as to actions pending before its enactment.*" 20 Am.Jur.2d *Courts* section 150, p. 497 (2d ed. 1965) (Emphasis added.)

9. See note 5, *supra.*

10. It would appear that the district court would be required to abstain from a contract case under the provisions of section 1334(c)(2), Title 28, United States Code.

11. For "substantive" consolidation to be proper, it must be shown "that the debts and assets of the several entities were identical or 'hopelessly intermingled.'" *Matter of Perry, Adams and Lewis Securities, Inc.,* 34 B.R. 155, 159, n. 6 (Bkrtcy.W.D.Mo.1983). "The power to consolidate should be used sparingly because of the possibility of unfair treatment of creditors of a corporate debtor who have dealt solely with that

It is true that the individual debtor may be interested in the amount of assets distributed in the corporate bankruptcy because of his possible status as a guarantor of the corporate debt or his potential responsibility for corporate tax obligations under section 6672, Title 26, United States Code. But that has not, in the past, been regarded as a sufficient interest to grant standing to object to matters relating to collection and distribution of the assets of the corporate bankruptcy estate. See *Matter of Financial Corporation,* Civil Action No. 82–0509–CV–W–3 (W.D.Mo. Jul. 30, 1982, Hunter J.), affirmed, 706 F.2d 875 (8th Cir.1983), to the following relevant effect:

> "The appellant ... has individually guaranteed various loans and obligations incurred by the bankrupt. According to the appellant, if a sufficient number of claims against the bankrupt are allowed, and if the assets of the bankrupt are insufficient to pay all of the claims and if the appellant's guarantees of the various loans and obligations are enforceable and enforced, then the appellant may be subject to some level of individual liability.... In this Circuit, an aggrieved party, for purposes of appealing the decision of the Bankruptcy Court, is one who is directly and adversely pecuniarily affected by the decision of the Bankruptcy Court. *Hartman Corporation of America v. United States,* 304 F.2d 429, 431 (8th Cir.1962). Arguably, the appellant

may suffer an adverse pecuniary affect as a result of the allowance of the claims in question. However, this adverse pecuniary effect is hardly certain or direct. The appellant has exposure to individual liability only if a sufficient number of claims are allowed against the bankrupt's estate and the assets of the bankruptcy estate are insufficient to satisfy those claims and the individual guarantees of the appellant are enforceable and enforced. This potential individual liability is simply too tenuous and indirect to make the appellant an aggrieved party. "This case is distinguished from *Kapp v. Naturelle, Inc.,* 611 F.2d 703 (8th Cir. 1979), (in that) ... (h)ere, the objection to the allowed claims is not made by the bankrupt, but rather by a creditor and guarantor."

Accordingly, this court concludes that the motion of the individual debtor should be denied for the separate, independent and additional reason that he has no standing to attack the trustee's actions in the corporate bankruptcy case.

It is therefore

ORDERED that the objection of the debtor Stephen Randel Blum to the compromise and settlement of *Daniels, trustee, v. General Motors Acceptance Corporation,* Adversary Action No. 83–0192–SW (Bkrtcy.W.D.Mo. Jul. 28, 1983), be, and it is hereby, denied.[12]

---

debtor without knowledge of its interrelationships with others." *Chemical Bank New York Trust Co. v. Kheel,* 369 F.2d 845, 847 (2d Cir. 1966). It is recognized that Blum Chevrolet, Inc., is contended to be one of the petitioners in this matter, but it has no real interest in the collection or distribution of the estate. It is the individual debtor who has, according to the statements made to the court, the real interest.

12. The court is aware of the debtors' contention that, as expressed in counsel's letter to the court dated February 21, 1985, "General Motors Acceptance Corporation furnished the Courts with a copy of the agreement authorizing this dealer holdback, which agreement provided that the two (2%) holdback would be returned to the dealers if there were no bad debt experience. Thus, this case is distinguished from other cases relating to dealer holdback." The papers in the former adversary file, however, do not *clearly*

reflect such an agreement. But, even if they did, the proviso that there be no "bad debt experience" is a sufficiently discretionary condition to prevent this court from holding that there was a clear right to payment on the basis of the facts known at the time of the settlement. There is, in the file, an "optional non-recourse agreement," purporting to have been executed by Blum Chevrolet, Inc., and GMAC on September 29, 1980, which provides for annual payment of "the amount of Dealer Credits held for Dealer's account (which) exceeds a sum equal to 3% of the aggregate unpaid balance under all retail contracts then outstanding," figured after debiting charges against the dealer. But, according to the discovery conducted by the trustee in the former adversary action, there was some $15,771.47 payments still outstanding under "standard" retail agreements not subject to the "optional non recourse" agreement. Of the "optional non recourse" agreements on which

---

payments were outstanding, there was some $162,767.93. Three per cent of the latter figure is $4,883.04. And this figure combined with the $15,771.47 exceeds the amount then in the dealer reserve account—$15,704.21.