954 F.2d 1
 26 Collier Bankr.Cas.2d 372, Bankr. L. Rep. P 74,431,
22 Envtl. L. Rep. 20,719
 In re HEMINGWAY TRANSPORT, INC., et al., Debtors.
WOBURN ASSOCIATES, Appellant,
v.
Herbert C. KAHN, Trustee for Hemingway Transport, Inc. and
Bristol Terminals, Inc., Appellees.
In re HEMINGWAY TRANSPORT, INC., et al., Debtors.
WOBURN ASSOCIATES, Appellee,
v.
Herbert C. KAHN, Trustee for Hemingway Transport, Inc. and
Bristol Terminals, Inc., Appellants.
 Nos. 91-1389, 91-1437.
 United States Court of Appeals,
First Circuit.
 Heard Sept. 3, 1991.
Decided Jan. 16, 1992.
 
 Thomas V. Urmy, Jr., with whom Michelle H. Blauner and Shapiro, Grace & Haber, Boston, Mass., were on brief, for Woburn Associates.
 Martin P. Desmery with whom William F. Macauley, Peter J. Roberts and Craig and Macauley P.C., Boston, Mass., were on brief, for Herbert C. Kahn, Trustee.
 Before CAMPBELL, Circuit Judge, BOWNES, Senior Circuit Judge, and CYR, Circuit Judge.
 CYR, Circuit Judge.
 
 
 1
 In the competition for what little is left for distribution in the consolidated chapter 7 estate of Bristol Terminals, Inc. and Hemingway Transport, Inc., Woburn Associates appeals from a district court judgment affirming a bankruptcy court order denying Woburn's request for administrative priority status for attorney fees incurred in defending against a postpetition action brought by the trustee in bankruptcy. The trustee in bankruptcy cross-appeals, challenging the affirmance of a bankruptcy court order allowing Woburn's claim for attorney fees as an unsecured prepetition claim. 126 B.R. 650.I
 
 BACKGROUND
 
 2
 Hemingway, a Massachusetts corporation, leased a parcel of real estate ("Property") from Woburn in 1974. The lease contained an indemnification clause whereby Hemingway agreed to hold Woburn harmless for all attorney fees incurred by Woburn as a consequence of Hemingway's occupation and possession of the Property.[1] In 1980, Woburn sold the Property to Bristol, the wholly-owned subsidiary of Hemingway, receiving in return, inter alia, Bristol's $100,000 purchase money note secured by a second mortgage on the Property.
 
 
 3
 In 1982, Hemingway and Bristol simultaneously filed voluntary chapter 11 petitions pursuant to Bankruptcy Code §§ 109(d) and 301, 11 U.S.C. §§ 109(d) & 301 (1987). An application for an order authorizing joint administration of the Bristol and Hemingway chapter 11 estates was immediately granted by the bankruptcy court. See Fed.R.Bankr.P. 1015(b). Woburn promptly filed its proof of claim based on the Bristol note and second mortgage.[2] Woburn did not file a separate proof of claim based on its indemnification agreement with Hemingway, Bristol's parent corporation.
 
 
 4
 Bristol, in its capacity as a chapter 11 debtor in possession, sold the Property to Juniper Development Group ("Juniper") in May 1983. Seven months later, the Hemingway-Bristol chapter 11 proceedings were voluntarily converted to chapter 7 liquidation proceedings and cross-appellant Kahn was appointed trustee in bankruptcy of both chapter 7 estates. See Fed.R.Bankr.P. 2009(c)(1). In April 1987, the bankruptcy court, after notice and hearing, granted the trustee's application for substantive consolidation of the chapter 7 estates. See 11 U.S.C. § 105(a). Woburn filed no further proof of its indemnification claim against the consolidated Bristol-Hemingway chapter 7 estate.
 
 
 5
 Meanwhile, in February 1986, the Environmental Protection Agency had issued an administrative order, pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. §§ 9601-9657 (1981 & Supp.1990), which required Juniper, as the owner, to clean up hazardous substances which had been discovered on the Property. After expending more than $60,000 to comply with the CERCLA order, Juniper initiated an adversary proceeding against the consolidated Bristol-Hemingway chapter 7 estate for indemnification and contribution on its CERCLA response costs, which are made recoverable from "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed...." 42 U.S.C. § 9607(a)(2) (emphasis added).[3]
 
 
 6
 The trustee in bankruptcy filed a third party complaint alleging that Woburn became a "potentially responsible party" under CERCLA section 9607(a) by virtue of its ownership of the Property between 1974 and 1980. Woburn counterclaimed against the trustee, asserting that its indemnification agreement with Hemingway shifted the risk of Woburn's potential CERCLA liability to Hemingway. The Woburn counterclaim also asserted for the first time that the indemnity clause in the Hemingway lease obligated the trustee in bankruptcy to hold Woburn harmless for the attorney fees incurred in defending against the trustee's third party action under CERCLA.
 
 
 7
 The bankruptcy court granted summary judgment for Woburn on the trustee's third party complaint, on the ground that the indemnification clause in Woburn's lease with Hemingway "evidence[d] a clear and unequivocal intent to redistribute risks [to Hemingway] for purposes of section 107(e)(1) of CERCLA that does not violate public policy." The bankruptcy court further ruled that the lease indemnification clause entitled Woburn to recover $51,395.84 in attorney fees from the chapter 7 estate.
 
 
 8
 Relying on Reading Co. v. Brown, 391 U.S. 471, 88 S.Ct. 1759, 20 L.Ed.2d 751 (1968), Woburn argued that its attorney fees were entitled to priority payment as an "administrative expense," see 11 U.S.C. §§ 503(b)(1)(A) & 507(a)(1), since the fees were incurred as a direct result of the frivolous and ill-advised third party action brought by the trustee against Woburn in an unsuccessful attempt to restore to the chapter 7 estate the monies disbursed to satisfy Juniper's CERCLA judgment against the estate. The bankruptcy court found that the third party action against Woburn was neither frivolous nor ill-advised, and that Woburn's counterclaim for attorney fees derived from its prepetition indemnity agreement with Hemingway. The court accordingly denied administrative priority status and allowed Woburn's counterclaim as an unsecured prepetition claim.
 
 
 9
 Woburn appealed to the district court. The trustee cross-appealed, asserting that Woburn's failure to file a timely proof of claim under its lease indemnification agreement with Hemingway barred any distribution to Woburn, even as the holder of an unsecured claim. The district court affirmed the bankruptcy court order disallowing administrative priority status, but dismissed the trustee's cross-appeal on the ground that Woburn was not the holder of a "claim" for attorney fees against Hemingway at the commencement of the case, see 11 U.S.C. § 101(4), and that "[i]t would be unjust to punish Woburn for its failure to predict this lawsuit several years before its filing."
 
 II
 DISCUSSION
 
 10
 A. The Woburn Appeal: Administrative Expense Priority
 
 
 11
 Woburn contends on appeal that the bankruptcy court committed reversible error by disallowing its request for priority payment of its attorney fees as an administrative expense. See 11 U.S.C. §§ 503(a), (b)(1)(A) & 507(a)(1). Woburn argues that administrative priority status is appropriate in these circumstances as a deterrent against the frivolous and ill-advised decision of the trustee to activate Woburn's right to indemnification under the Hemingway lease by commencing the third party action against Woburn. See, e.g., In re E.A. Nord Co., 78 B.R. 289, 292 (Bankr.W.D.Wash.1987). Woburn argues alternatively that principles of fundamental fairness warrant priority payment of its attorney fees as an administrative expense incurred as a consequence of the trustee's operation of the business of the debtor estate. See Reading Co. v. Brown, 391 U.S. 471, 88 S.Ct. 1759, 20 L.Ed.2d 751 (1968).
 
 
 12
 The traditional presumption favoring ratable distribution among all holders of unsecured claims counsels strict construction of the Bankruptcy Code provisions governing requests for priority payment of administrative expenses. See Southern Ry. Co. v. Johnson Bronze Co., 758 F.2d 137, 141 (3d Cir.1985); In re Chicago, Milwaukee, St. Paul & Pacific R.R. Co., 658 F.2d 1149, 1163 (7th Cir.), cert. denied sub nom., Railway Labor Executives Ass'n. v. Ogilvie, 455 U.S. 1000, 102 S.Ct. 1632, 71 L.Ed.2d 867 (1982); In re Philadelphia Mortgage Trust, 117 B.R. 820, 825 (Bankr.E.D.Pa.1990); In re Massetti, 95 B.R. 360, 363 (Bankr.E.D.Pa.1989); In re SMB Holdings, Inc., 77 B.R. 29, 32 (Bankr.W.D.Pa.1987) (conferral of administrative expense priority where not clearly entitled under the Code dilutes priorities scheme prescribed by Congress). The burden of proving entitlement to priority payment as an administrative expense therefore rests with the party requesting it. See Woods v. City Nat. Bank & Trust Co., 312 U.S. 262, 268, 61 S.Ct. 493, 497, 85 L.Ed. 820 (1941); In re Patch Graphics, 58 B.R. 743, 745 (Bankr.W.D.Wis.1986).
 
 
 13
 The Bankruptcy Code permits top priority payment of "actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case," 11 U.S.C. § 503(b)(1)(A), as a means of enabling the debtor estate to acquire the requisite postpetition credit with which to preserve itself after the filing of the petition. Preservation of the estate includes protection of the assets of the estate, as well as postpetition operation of the business of the debtor. See, e.g., In re Mammoth Mart, Inc., 536 F.2d 950, 954 (1st Cir.1976); In re Jartran, Inc., 732 F.2d 584, 586 (7th Cir.1984); In re Pierce Coal & Constr., Inc., 65 B.R. 521, 530 (Bankr.D.W.Va.1986).
 
 
 14
 As a general rule, a request for priority payment of an administrative expense pursuant to Bankruptcy Code § 503(a) may qualify if (1) the right to payment arose from a postpetition transaction with the debtor estate, rather than from a prepetition transaction with the debtor, and (2) the consideration supporting the right to payment was beneficial to the estate of the debtor. See In re Mammoth Mart, Inc., 536 F.2d at 954; see also Jartran, 732 F.2d at 587. There is no dispute that Woburn's request for priority payment of the attorney fees incurred in defending against the third party action brought by the trustee in bankruptcy cannot meet the traditional Mammoth Mart criteria.[4]
 
 
 15
 We have recognized a special category of expense entitled to administrative priority status, based on considerations of fundamental fairness, see Reading Co., 391 U.S. at 477, 88 S.Ct. at 1763, consisting of amounts due entities "injured by the debtor-in-possession's operation of the business even though their claims did not arise from transactions that were necessary to preserve or rehabilitate the estate." In re Mammoth Mart, 536 F.2d at 954.[5]
 
 
 16
 In Reading, a receiver appointed to operate the debtor's business in a Chapter XI arrangement proceeding negligently caused fire losses to several neighboring business establishments. The debtor was adjudicated bankrupt. The injured parties filed requests for priority payment of their losses as administrative expenses incurred after the commencement of the Chapter XI proceeding. The trustee in bankruptcy objected on the ground that the fire losses sustained as a result of the receiver's negligence conferred no benefit on the Chapter XI estate, either by preserving its assets or by facilitating its postpetition business operations. Reading, 391 U.S. at 473-74, 88 S.Ct. at 1761.
 
 
 17
 The Supreme Court disagreed with the lower courts and concluded that the requests for priority payment of the fire losses should take precedence over the claims of unsecured creditors for whose ultimate benefit the business of the debtor had been operated during the Chapter XI arrangement proceeding. The Court first acknowledged the "decisive, statutory objective [of] fairness to all persons having claims against the insolvent." Id. at 477, 88 S.Ct. at 1763. The Court went on to point out as follows:
 
 
 18
 At the moment when an arrangement is sought, the debtor is insolvent. Its existing creditors hope that by partial or complete postponement of their claims they will, through successful rehabilitation, eventually recover from the debtor either in full or in larger proportion than they would in immediate bankruptcy. Hence the present petitioner did not merely suffer injury at the hands of an insolvent business: it had an insolvent business thrust upon it by operation of law.
 
 
 19
 Id. at 478, 88 S.Ct. at 1736 (emphasis added).
 
 
 20
 Unlike losses sustained by creditors who enter into voluntary prepetition transactions with the debtor, the fire losses in Reading resulted from unilateral postpetition conduct on the part of the operating receiver, "ordinarily incident to the operation of a business." Id. at 483, 88 S.Ct. at 1766. We have extended the Reading rationale to encompass postpetition fines occasioned by an operating chapter 11 debtor in possession's intentional disregard of a state court order enjoining local zoning ordinance violations:
 
 
 21
 The debtor in this case deliberately continued a violation of law month after month presumably because it was more lucrative for the business to operate outside the zoning ordinance than within it. If fairness dictates that a tort claim based on negligence [Reading ] should be paid ahead of pre-reorganization claims, then, a fortiori, an intentional act which violates the law and damages others should be so treated.
 
 
 22
 In re Charlesbank Laundry, Inc., 755 F.2d 200, 203 (1st Cir.1985) (emphasis in original).
 
 
 23
 Woburn's request for allowance of an administrative expense priority is not within the ambit of either Reading or Charlesbank, for the simple reason that its attorney fees were incurred in resisting the efforts of the chapter 7 trustee to liquidate the CERCLA claim against Woburn. The postpetition operation of the Bristol-Hemingway business under chapter 11 in no manner caused or contributed to the attorney fees incurred by Woburn in resisting the chapter 7 trustee's third party action under CERCLA. Rather, the third party action against Woburn was brought by the trustee in bankruptcy in the ordinary course of the liquidation of the assets of the consolidated chapter 7 estate for distribution among Bristol-Hemingway creditors. While we do not decide that a Reading- Charlesbank administrative expense priority may never be appropriate in the context of a chapter 7 liquidation proceeding, we are nevertheless satisfied that neither fundamental fairness nor economic necessity would warrant its allowance in the present circumstances.
 
 
 24
 Woburn's request for allowance of an administrative expense priority cannot be distinguished on any principled basis from any other prevailing party's request for priority payment of attorney fees incurred in defending against a lawsuit brought by a chapter 7 trustee engaged in the routine liquidation of the assets of the chapter 7 estate. A chapter 7 trustee's lawsuit may indeed impose burdensome litigation expense upon successful and unsuccessful defendants alike, yet its prepetition genesis ultimately distinguishes it from the postpetition losses accorded priority in Reading and Charlesbank. Woburn's prepetition ownership of the Property and its prepetition lease with Hemingway, respectively, provided the grounds for the trustee's third party complaint and Woburn's counterclaim. Thus, Woburn's request for administrative expense priority cannot qualify under the Reading- Charlesbank exception, since its attorney fees were incurred in resisting the trustee's third party action for CERCLA contribution based on Woburn's prepetition ownership of the Property, which had nothing whatever to do with any postpetition operation of the Bristol-Hemingway business.[6] We are aware of no authority that the Reading- Charlesbank exception encompasses a right to payment originating in a prepetition contract with the debtor.[7]
 
 B. The Trustee's Cross-Appeal:
 
 25
 1. Lease Indemnification Agreement as "Contingent Claim"
 
 
 26
 The trustee in bankruptcy cross-appeals on the ground that Woburn's failure to file timely proof of its contingent prepetition indemnification claim under the Hemingway lease precludes Woburn from any distribution from the chapter 7 estate, even as the holder of an unsecured claim. Woburn responds that it possessed no "right to payment" under the indemnification agreement until the trustee instituted the third party action which caused Woburn to incur the attorney fees at issue on appeal. Woburn argues that any prepetition "right to payment" would not have been susceptible to reasonable valuation at the time of the filing of the Bristol and Hemingway chapter 11 petitions in 1982.
 
 
 27
 Woburn's argument disregards the remodeled claim allowance process set in place by the Bankruptcy Reform Act of 1978. Under the Bankruptcy Act of 1898, allowance of a timely proof of claim, and hence the right to participate in distribution, depended on the "provability" of the claim. See Bankruptcy Act § 63(a), 11 U.S.C. § 103(a). Consequently, a contingent or unliquidated claim incapable of either reasonable or expeditious valuation was disallowed entirely, as unprovable. See Bankruptcy Act § 57(d), 11 U.S.C. § 93(d); see also In re Esgro, Inc., 645 F.2d 794, 798 (9th Cir.1981).
 
 
 28
 The inequitable results occasioned by the "provability" requirement under the Bankruptcy Act--precluding the would-be creditor from participating in distribution and the debtor from obtaining a discharge of the debt--ill served the two principal legislative policies federal bankruptcy law was meant to foster. See In re Johns-Manville Corp., 57 B.R. 680, 686-87 (Bankr.S.D.N.Y.1986). Congress eventually jettisoned the "provability" requirement by defining "claim" as broadly as practicable. Under the Bankruptcy Code, a "claim" is a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." 11 U.S.C. § 101(4). Of course, "allowance" remains a prerequisite to distribution under the Bankruptcy Code, see 11 U.S.C. § 726; In re Butterworth, 50 B.R. 320, 322 (Bankr.W.D.Mich.1984), but the bankruptcy court is required, for purposes of allowance, to estimate the amount of every timely contingent or unliquidated prepetition claim, even if a nominal estimate alone is practicable. See 11 U.S.C. § 502(c); H.R.Rep. No. 595, 95th Cong., 1st Sess. 352-354 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 65 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5851, 6307, 6309, 6310; Lawrence D. King, 3 Collier on Bankruptcy § 502.02, at 502-20 (15th ed. 1991).
 
 
 29
 The difficulty or impossibility of estimation no longer constitutes a legitimate basis for disallowing any prepetition right to payment as a "claim" against the estate. See In re Baldwin-United Corp., 55 B.R. 885, 898 (Bankr.S.D.Ohio 1985) ("An estimate necessarily implies no certainty.... It is merely ... for the purpose of permitting the case to go forward." (quoting In re Nova Real Estate Inv. Trust, 23 B.R. 62, 66 (Bankr.E.D.Va.1982))).[8] These legislative changes were devised deliberately to permit " 'the broadest possible relief in the bankruptcy court,' " In re Black, 70 B.R. 645, 649 (Bankr.D.Utah 1986) (quoting H.R.Rep. No. 95-595, 95th Cong., 1st Sess. 309 (1977), U.S.Code Cong. & Admin.News 1978, p. 6266), and to ensure that "virtually all obligations to pay money [would] be amenable to treatment in bankruptcy." In re Robinson, 776 F.2d 30, 34 (2d Cir.1985) (survey of post-Bankruptcy Act cases recognizing statutory expansion of term "claim"), rev'd on other grounds, 479 U.S. 36, 107 S.Ct. 353, 93 L.Ed.2d 216 (1986). As most courts now recognize, the term "claim" is broad enough to encompass an unliquidated, contingent right to payment under a prepetition indemnification agreement executed by the debtor, even though the triggering contingency does not occur until after the filing of the petition under the Bankruptcy Code. See, e.g., In re THC Financial Corp., 686 F.2d 799, 802-04 (9th Cir.1982).[9]
 
 
 30
 Given the great breadth of the term "claim" as defined under the Bankruptcy Code, we conclude that Woburn held a prepetition claim against Hemingway at the time of the chapter 11 petition in 1982, albeit a right to payment contingent on a future occurrence reasonably within the contemplation of the parties as evidenced by the terms of the indemnification agreement. See supra note 1. That the claim remained contingent, unliquidated and unmatured at the time of the filing of the chapter 11 petition is immaterial to Woburn's obligation to file a timely proof of claim under the Bankruptcy Code. Although valuation of Woburn's contingent right to indemnification by Hemingway would have been difficult, if not impossible, to estimate with reasonable precision in 1982 or 1983, these considerations are no longer determinative of either the characterization or the allowability of a "claim" under the Code. We hold, nonetheless, on other grounds, see Max Sugarman Funeral Home, Inc. v. A.D.B. Investors, 926 F.2d 1248, 1253 n. 9 (1st Cir.1991); Norris v. Lumbermen's Mut. Cas. Co., 881 F.2d 1144, 1151-52 (1st Cir.1989) (court of appeals may affirm on any ground supported by record), that the bankruptcy court and the district court correctly concluded that Woburn's counterclaim for attorney fees was allowable as a general unsecured claim against the consolidated Bristol-Hemingway chapter 7 estate.
 
 2. Woburn's Proof of Claim
 
 31
 The timely proof of claim Woburn filed against the Bristol chapter 11 estate in 1982 asserted a right to payment based on (and included a copy of) the second mortgage, which explicitly provides that the sale and second mortgage of the Property were "subject to" the 1974 Hemingway lease, containing the indemnification clause. For instance, in one of the more significant mortgage provisions, Bristol categorically warranted that it would not "modify, amend, cancel or permit the surrender of the lease with Hemingway Transport" without Woburn's consent. As surely as a trustee in bankruptcy would be found to have been on notice of Woburn's second mortgage on the Property, and of the Hemingway lease, by reason of the recordation of the second mortgage, Woburn's 1982 proof of claim placed the Bristol chapter 11 estate on reasonable notice of Woburn's contingent indemnification claim under the 1974 lease with Hemingway.[10] See, e.g., In re Simms, 40 B.R. 186, 187-88 (Bankr.N.D.Ga.1984) (notice requirements of amendable proof of claim).
 
 
 32
 Although the original proof of claim ascribed no several value to Woburn's contingent right to indemnification, in no event would there have been any reasonably reliable means of doing so until the occurrence of the postpetition contingency covered by the Hemingway indemnification agreement. Similarly, for purposes of its allowance in 1982 any separate proof of claim under Woburn's indemnification agreement could have been assigned no more than nominal value, subject to amendment under Bankruptcy Rule 3008 at such time as the right to indemnification matured. See Fed.R.Bankr.P. 3008. Moreover, as a general rule, amendments intended merely to increase the amount of a claim grounded in the same right to payment are not considered "new" claims under the Code. See In re Hanscom Retail Foods, Inc., 96 B.R. 33, 35 (Bankr.E.D.Pa.1988); In re White Motor Corp., 59 B.R. 286, 288 (Bankr.N.D.Ohio 1986).
 
 
 33
 The counterclaim Woburn filed in the third party CERCLA contribution action brought by the trustee in bankruptcy constituted an allowable amendment to Woburn's 1982 proof of claim.[11] Amendments to proofs of claim timely filed are to be freely allowed, whether for purposes of particularizing the amount due under a previously-asserted right to payment, or simply to cure technical defects in the original proof of claim. See, e.g., In re Sambo's Restaurants, Inc., 754 F.2d 811, 816-17 (9th Cir.1985). If allowed, of course, the amendment relates back to the filing of the original proof of claim. Id.
 
 
 34
 The equitable determination to allow or disallow an amendment to a proof of claim timely filed is entrusted to the sound discretion of the bankruptcy court. In re AM Int'l, Inc., 67 B.R. 79, 81 (Bankr.N.D.Ill.1986). The court must scrutinize both the substance of the proposed amendment and the original proof of claim to ensure that the amendment meets three criteria. First, the proposed amendment must not be a veiled attempt to assert a distinctly new right to payment as to which the debtor estate was not fairly alerted by the original proof of claim. See, e.g., In re Metro Transp. Co., 117 B.R. 143, 147 (Bankr.E.D.Pa.1990). Second, the amendment must not result in unfair prejudice to other holders of unsecured claims against the estate. See In re McLean Industries, Inc., 121 B.R. 704, 708-09 (Bankr.S.D.N.Y.1990); cf. In re Sambo's Restaurants, 754 F.2d at 816-17 (absent any showing of prejudice to opposing party, amendment freely allowed). Third, the need to amend must not be the product of bad faith or dilatory tactics on the part of the claimant. See McLean, 121 B.R. at 708-09. The Woburn counterclaim meets all criteria for an allowable amendment.
 
 
 35
 First, as previously discussed, the genesis of Woburn's indemnification counterclaim for attorney fees lay in the same prepetition lease-sale-mortgage transaction which was the subject of Woburn's original proof of claim. Thus, the Woburn counterclaim to the third party complaint for CERCLA contribution relating to the Property can in no sense be considered an entirely new "claim," see supra notes 2 & 10, as defined under the Bankruptcy Code, see supra Section B.1.
 
 
 36
 Second, other holders of unsecured claims against the consolidated Bristol-Hemingway chapter 7 estate were caused no unfair prejudice even though the 1982 proof of claim was filed directly against Bristol, rather than Hemingway. Cf. Liakas v. Creditors' Comm. of Deja Vu, Inc., 780 F.2d 176, 178 (1st Cir.1986) (per curiam) (absent an order either for joint administration or substantive consolidation, proof of claim filed against one corporate debtor cannot be deemed filed against estate of another corporate debtor). The procedural posture of the Bristol-Hemingway proceedings before the bankruptcy court warrants the conclusion that the Hemingway estate and the Bristol estate, through their common representative--the trustee in bankruptcy--were on reasonable notice of Woburn's claimed right to indemnification under the 1974 Woburn-Hemingway lease.
 
 
 37
 Hemingway and Bristol filed simultaneous chapter 11 petitions in July 1982, along with an immediate application for joint administration of their estates.[12] Joint administration is a procedural device for "combining [certain related] estates by using a single docket for the matters occurring in the administration, including the listing of filed claims, the combining of notices to creditors of the different estates, and the joint handling of other purely administrative matters that may aid in expediting the cases and rendering the process less costly." Fed.R.Bankr.P. 1015 advisory committee's note (1983). The Bristol-Hemingway application for joint administration was immediately granted by the bankruptcy court, and the Hemingway and Bristol chapter 11 estates were thereupon jointly administered from the outset, utilizing a joint claims docket, as well as a single proceedings docket to record both debtors' statements of financial affairs, executory contracts, unexpired leases and schedules of assets.[13] This continuous unitary administration afforded both debtors in possession, as well as the cross-appellant trustee, no less opportunity to acquire actual notice of Woburn's 1982 proof of claim against Bristol than if a separate proof of claim had been filed against each estate. One simply could not have examined the 1982 proof of claim, filed against Bristol and docketed on the joint Bristol-Hemingway claims docket, without being alerted to Woburn's indemnification agreement with Hemingway.
 
 
 38
 Moreover, after notice and hearing in April 1987, the bankruptcy court granted cross-appellant's motion for substantive consolidation of the Bristol and Hemingway chapter 7 estates.[14] Whereas joint administration is designed in large part to promote procedural convenience and cost efficiencies which do not affect the substantive rights of claimants or the respective debtor estates, see Unsecured Creditors Committee v. Leavitt Structural Tubing Co., 55 B.R. 710 (N.D.Ill.1985), aff'd, 796 F.2d 477 (7th Cir.1986), substantive consolidation merges the assets and liabilities of the debtor entities into a unitary debtor estate,[15] to which all holders of allowed claims are required to look for distribution. See In re Steury, 94 B.R. 553, 554 (Bankr.N.D.Ill.1988); In re N.S. Garrott & Sons, 63 B.R. 189, 191 (Bankr.E.D.Ark.1986). Since consolidation can cause disproportionate prejudice among claimants required to share the debtors' pooled assets, the party requesting substantive consolidation must satisfy the bankruptcy court that, on balance, consolidation will foster a net benefit among all holders of unsecured claims.[16] Thus, the order for substantive consolidation, obtained at the instance of the cross-appellant trustee, constitutes an implicit determination by the bankruptcy court that any inequity to particular claimants would be overborne by the benefits to claimants generally.
 
 
 39
 Finally, there is no evidence whatever from which to infer that Woburn intentionally refrained, out of any improper or dilatory purpose, from asserting a more particularized indemnification claim under the 1974 lease in its original proof of claim. Rather, Woburn counterclaimed against the consolidated chapter 7 estate immediately after the trustee in bankruptcy brought the third party complaint for contribution to the cost of the CERCLA clean-up of the Property covered by the Hemingway lease and Bristol's second mortgage. In these circumstances, as the district court supportably concluded, "[i]t would be unjust to punish Woburn for its failure to predict [the trustee's third party action] several years before its filing." On the basis of the record in these proceedings, therefore, we hold that there was no abuse of discretion in the allowance of Woburn's counterclaim for indemnification for attorney fees as an amended unsecured claim, see 11 U.S.C. § 726(a)(2)(A), against the consolidated Bristol-Hemingway chapter 7 estate.
 
 
 40
 Affirmed; no costs to either party.
 
 
 
 [1]
 The indemnity clause in the Property lease provided, in pertinent part, that Hemingway, as lessee, would hold Woburn harmless
 against all liabilities, obligations, damages, penalties, claims, costs, charges and expenses, reasonable attorneys fees which might be imposed upon, incurred by or asserted against the lessor by reason of any work or thing done in, on or about the Property, any use, nonuse, condition, maintenance or management of the Property, any negligence on its part or on the part of its agents, any accident, injury or damage to any person or property occurring in, on, or about the property, and any failure on its part to perform or comply with any of the covenants, agreements or conditions contained in the lease to be performed or complied with.
 (Emphasis added).
 
 
 [2]
 The Woburn proof of claim included a copy of Bristol's second mortgage, with its numerous explicit references to the Hemingway lease. The mortgage unmistakably provides that the sale and mortgage of the Property were "subject to" the Hemingway lease and indemnity clause. See also infra note 10 & accompanying text
 
 
 [3]
 In January 1990, the bankruptcy court granted summary judgment in the amount of $38,763.60 against the trustee in bankruptcy on Juniper's claim for past response costs and accorded it administrative priority status against the consolidated chapter 7 estate. Earlier, the bankruptcy court had granted partial summary judgment in favor of the trustee on Juniper's claim for future response costs, on the ground that Bankruptcy Code § 502(e)(1)(B) required disallowance. Section 502(e)(1)(B) states that "the court shall disallow any claim for reimbursement or contribution of an entity that is liable with the debtor ... to the extent that ... such claim for reimbursement or contribution is contingent as of the time of allowance or disallowance...." 11 U.S.C. § 502(e)(1)(B) (emphasis added)
 
 
 [4]
 A right to payment predicated on an executed prepetition contract is not entitled to priority payment as an administrative expense. In re Mammoth Mart, 536 F.2d at 954. Woburn was not awarded attorney fees in its postpetition third party action with the trustee in bankruptcy. Instead, its § 503(a) request for payment of its attorney fees as an administrative expense was based entirely on its prepetition lease indemnification agreement with Hemingway. The lease agreement was no longer executory, as no further performance or consideration remained due from Woburn at the filing of Hemingway's chapter 11 petition. See In re Wegner, 839 F.2d 533, 536 (9th Cir.1988); see also In re Public Serv. Co. of N.H., 884 F.2d 11, 14 (1st Cir.1989). Indeed, although the trustee anticipated that the third party action would enhance the chapter 7 estate, Woburn concedes that no such benefit accrued
 
 
 [5]
 Most decisions employing the Reading rationale have arisen in the context of reorganization proceedings. See, e.g., In re Microfab, Inc., 105 B.R. 161, 168 n. 20 (Bankr.D.Mass.1989) (Reading- Charlesbank rationale inapplicable in liquidating chapter 7 case). But cf. In re Pierce Coal & Constr., Inc., 65 B.R. at 530 (Reading applicable where chapter 7 trustee operated business of debtor). Application of the Reading- Charlesbank rationale in the context of an ordinary, nonoperating liquidation proceeding appears extremely problematic, as one fundamental justification for the priority is that general creditors stand to benefit from the postpetition operation of the debtor's business, either through the immediate generation of operating profits or through the ultimate reorganization of the debtor as a viable business entity
 
 
 [6]
 The only arguable basis for asserting that Woburn's attorney fee expense did not derive, in its entirety, from Woburn's prepetition ownership of the Property would be that the third party action was so groundless that its commencement constituted a distinct postpetition injury to Woburn such as would warrant an award of counsel fees to the prevailing party. See, e.g., Fed.R.Civ.P. 11. The difficulties with such an assumption in the present case are twofold. First, the bankruptcy court supportably found that the trustee's action, though unsuccessful, was neither frivolous nor ill-advised. Moreover, the district court upheld the bankruptcy court determination that the trustee's action was not "frivolous," since earlier decisions had not been in agreement as to whether any pre-CERCLA indemnification agreement could shift the risk of CERCLA liability to the indemnitor. Second, it is by no means clear, nor do we suggest, that the commencement of a groundless lawsuit by the trustee in bankruptcy would warrant allowance of an administrative expense priority to the detriment of holders of unsecured claims. It might be that the more appropriate recourse for the prevailing defendant in such circumstances would be against the trustee in bankruptcy, or the trustee's attorney, or by way of an action to surcharge the trustee's bond. See, e.g., In re San Juan Hotel Corp., 847 F.2d 931, 937 (1st Cir.1988); see also 11 U.S.C. § 322(b), (d); Fed.R.Bankr.P. 2010
 
 
 [7]
 The source of the claimant's right to payment in all of the decisions cited by Woburn invariably originated during the postpetition period. For example, in Reading, 391 U.S. at 473-74, 88 S.Ct. at 1761, the claimants based their right to damages solely on a negligent act of the receiver during the operation of the insolvent business. In Charlesbank, 755 F.2d at 201, although claimants were awarded civil fines as compensation for damages caused by the debtor in possession's continuing violations of an injunction, their claim for administrative priority included only those expenses, consisting of attorney fees, directly attributable to the debtor in possession's postpetition violations. The damages attributable to prepetition violations by the debtor were allowed as general unsecured claims. In Yorke v. NLRB, 709 F.2d 1138, 1140, 1143 (7th Cir.1983), cert. denied, 465 U.S. 1023, 104 S.Ct. 1276, 79 L.Ed.2d 680 (1984), the backpay claim was traceable not to the prepetition collective bargaining agreement, but to an independent postpetition NLRB order entered pursuant to the Board's discretionary authority under the National Labor Relations Act, designed to restore the union's bargaining power following the trustee's unannounced postpetition decision to close down a plant. In In re Met-L-Wood Corp., 103 B.R. 972, 975, 976-77 (Bankr.N.D.Ill.1989), aff'd, 115 B.R. 133, 136 (N.D.Ill.1990), the claimant, counsel to the chapter 11 debtor in possession, sought administrative expense priority for attorney fees incurred in defending against allegations by the trustee, after the case was converted to chapter 7, that claimant was involved in a fraudulent postpetition sale of the debtor's assets. The claimant based his priority claim on his right, under general principles of attorney-client agency, to reimbursement for postpetition services rendered as an "agent" of the debtor in possession. In Nord, 78 B.R. at 290, the claim for attorney fees was founded on an arbitration award, concluded during the chapter 11 proceedings, based on the arbitrator's discretionary power to impose fees under 29 U.S.C. § 1401(a)(2). In none of these cases did the claimants possess a prepetition "claim."
 
 
 [8]
 Under Bankruptcy Code § 502(j), the holder of a contingent claim incorrectly estimated at the time of allowance may request reconsideration and the court "may increase or decrease the amount of [the] prior allowance ... or enter any other appropriate order." Fed.R.Bankr.P. 3008 advisory committee's note (1983)
 
 
 [9]
 Woburn relies on In re M. Frenville Co., 744 F.2d 332 (3d Cir.1984), cert. denied, 469 U.S. 1160, 105 S.Ct. 911, 83 L.Ed.2d 925 (1985), as authority for its contention that it was not necessary to file a proof of claim. Notwithstanding the expansive Code definition of the term "claim," Frenville held that the threshold requirement that the holder of the claim have an identifiable prepetition "right to payment" is controlled by non-bankruptcy law. Id. at 337. Because a defendant in a state court action sought to implead the debtors on a general theory of indemnification, rather than on the basis of a written indemnification contract with the debtors, the Frenville court concluded that any "claim" for indemnification did not arise under New York law until the state court action was instituted against the defendant. Since the suit against defendant was brought after the filing of the debtors' petitions in bankruptcy, the automatic stay was held inapplicable to the defendant's third party claim for indemnification, and the defendant was allowed to implead the debtors in the state court action. Id
 Woburn's reliance on Frenville is unavailing for at least two reasons. First, more recent decisions consistently have declined to accept the Frenville reasoning and its failure to accord full breadth to the term "claim," see, e.g., In re Yanks, 49 B.R. 56, 58 (Bankr.S.D.Fla.1985), and have taken particular exception to Frenville's focus on the maturation or accrual of an indemnification claim. See, e.g., In re THC Financial Corp., 686 F.2d at 802-04 (no abuse of discretion in characterization of written indemnification agreement as contingent claim, despite postpetition breach); In re Black, 70 B.R. at 650-51 (indemnification counterclaim based on state procedural law creates "contingent claim" at bankruptcy, even though claimants had no way of anticipating triggering event). These courts have found no indication in the language or legislative history of Bankruptcy Code § 101(4) that Congress intended Code "claim" criteria to turn on the peculiarities of state law, the timing of a lawsuit, or the claimant's failure to anticipate specific future contingencies.
 Second, and more importantly for present purposes, Frenville explicitly noted that "[t]he present case is different from one involving an indemnity or surety contract. When parties agree in advance that one party will indemnify the other party in the event of a certain occurrence, there exists a right to payment, albeit contingent, upon the signing of the agreement." Frenville, 744 F.2d at 336 (emphasis added).
 
 
 [10]
 The second mortgage provided that insurance policies on the Property held by Hemingway, as tenant under "the existing lease ... dated June 26, 1974," must include Woburn as a party insured, that Woburn would collect future condemnation awards on the Property to reduce Bristol's indebtedness on the second mortgage note, "[s]ubject ... to the provisions of the lease with Hemingway Transport " (emphasis added), and that Bristol's unilateral modification, amendment, cancellation, or acceptance of the surrender of the Hemingway lease without Woburn's prior written consent would constitute a mortgage default
 
 
 [11]
 It would be formalistic to deny amendatory consideration to Woburn's counterclaim merely for failure to style it as an "amendment" to the 1982 proof of claim. See, e.g., In re Pyramid Bldg. Co., 87 B.R. 38, 40 (Bankr.N.D.Ohio 1988) (amendments to proofs of claim need not be specifically labelled as such)
 
 
 [12]
 Bankruptcy Rule 1015(b)(4) provides that "[i]f ... two or more petitions are pending in the same court by or against ... a debtor and an affiliate, the court may order a joint administration of the estates." Fed.R.Bankr.P. 1015(b)(4). The Bankruptcy Code defines "affiliate" as a "corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by the debtor." 11 U.S.C. § 101(2)(B). Bristol was Hemingway's wholly-owned corporate subsidiary
 
 
 [13]
 After cross-appellant was appointed chapter 7 trustee, the bankruptcy court authorized joint administration of the chapter 7 estates
 
 
 [14]
 Substantive consolidation is not dealt with in specific terms by the Bankruptcy Code. Rather, the power to order substantive consolidation is premised on the broad language of Bankruptcy Code § 105(a), which provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this Title." See, e.g., In re Auto-Train Corp., 810 F.2d 270, 276 (D.C.Cir.1987)
 
 
 [15]
 Consolidation is permitted only if it is first established that the related debtors' assets and liabilities are so intertwined that it would be impossible, or financially prohibitive, to disentangle their affairs. See In re Augie/Restivo Baking Co., 860 F.2d 515, 519 (2d Cir.1988); In re R.H.N. Realty Corp., 84 B.R. 356, 358 (Bankr.S.D.N.Y.1988); In re Blum, 49 B.R. 422, 427 n. 1 (Bankr.W.D.Mo.1985). The trustee may request consolidation to conserve for creditors the monies which otherwise would be expended in prolonged efforts to disentangle the related debtors' affairs. See In re Evans Temple Church of God in Christ & Community Ctr., Inc., 55 B.R. 976, 981 (Bankr.N.D.Ohio 1986). Nevertheless, the bankruptcy court must balance the potential benefits of consolidation against any potential harm to interested parties. See In re Murray Industries, Inc., 119 B.R. 820, 829 (Bankr.M.D.Fla.1990); In re Steury, 94 B.R. 553, 554-55 (Bankr.N.D.Ill.1988)
 
 
 [16]
 The court otherwise might conclude that consolidation should not be permitted--especially if holders of unsecured claims reasonably relied on the fact that the related debtors were distinct entities at the time credit was extended. See, e.g., In re Amereco Envtl. Services, Inc., 125 B.R. 566, 568 (Bankr.W.D.Mo.1991); In re Helms, 48 B.R. 714, 717 (Bankr.D.Conn.1985); In re Ford, 54 B.R. 145, 148 n. 6 (Bankr.W.D.Mo.1984)